IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DALLAS COWBOYS FOOTBALL CLUB, LTD. and NFL PROPERTIES LLC, | § § § § | Civil Action No. 306-CV-1906K |
| Plaintiffs, | § § § | ECF CASE |
| v. | § § | |
| AMERICA'S TEAM PROPERTIES, INC., | § § § | |
| Defendant. | § § | |

**PLAINTIFF'S/COUNTERCLAIM DEFENDANT'S BRIEF IN SUPPORT OF
THEIR MOTION TO EXCLUDE FROM EVIDENCE THE REPORTS,
AFFIDAVIT AND TESTIMONY OF DEFENDANT/COUNTERCLAIMANT'S
"EXPERT" WITNESS JAMES T. BERGER**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT...........................................................................................................1

I.  THE COURT SHOULD PRECLUDE BERGER FROM SERVING AS AN
    EXPERT BECAUSE HE IS NOT QUALIFIED ..............................................3

    A.  Berger Does Not Understand and Is Not Qualified to Provide an
        Expert Opinion on the Issue of Likely Confusion.................................3

    B.  Berger Has Scant Experience in Surveys for Trademark Litigation .......4

II. BERGER'S CRITICISMS OF MR. GELB'S SURVEY DESIGN ARE
    UNRELIABLE AND IRRELEVANT ..............................................................5

    A.  Berger Lacks the Understanding with Which to Critique or Conduct a
        Likely-Confusion Study .......................................................................5

    B.  Berger's Criticisms of the Internet are Belied by His Own Words and
        Work....................................................................................................7

    C.  A Mall-Intercept Study Is Not Appropriate Here ................................10

    D.  Berger Misunderstands What Is a Proper Control................................12

    E.  Gender is a Non-Issue Here.................................................................14

III. BERGER'S SURVEY AND REPORT ARE UNRELIABLE AND
     IRRELEVANT ...........................................................................................15

    A.  Berger's Survey, *Not Gelb's*, Suffers from Irredeemable Geographic
        Bias ...................................................................................................16

    B.  Berger's Survey Improperly Led Respondents Away from Naming the
        Cowboys.............................................................................................19

    C.  Berger Improperly Biased and Insufficiently Instructed His
        Interviewers .......................................................................................20

CONCLUSION .....................................................................................................22

# TABLE OF AUTHORITIES

**Page**

## Cases

AHP Subsidiary Holding Co. v. Stuart Hale Co.,
  1 F.3d 611 (7th Cir. 1993) ............................................................................................. 14

Black v. Food Lion, Inc.,
  171 F.3d 308 (5th Cir. 1999) ......................................................................................... 22

Bocanegra v. Vicmar Servs., Inc.,
  320 F.3d 581 (5th Cir. 2003) ........................................................................................... 2

Brooks Shoe Mfg. Co., v. Suave Shoe Corp.,
  533 F. Supp. 75 (D.C. Fla. 1981), aff'd, 716 F.2d 854 (11th Cir. 1983) ......................... 22

Castellow v. Chevron USA,
  97 F. Supp. 2d 780 (S.D. Tex. 2000) ............................................................................... 2

Castrol, Inc. v. Pennzoil Quaker State Co., No. Civ. A. 00-2511,
  2000 WL 1556019 (D.N.J. Oct. 12, 2000) ..................................................................... 21

Classic Foods Int'l v. Kettle Foods, Inc., No. SACV 04-725 CJC (Ex),
  2006 WL 5187497 (C.D. Cal. March 2, 2006) ................................................................ 13

Continental Air Cond., Inc. v. Keller Const. Co.,
  No. B142230, 2003 WL 22120886 (Cal. App. 2 Dist. Sept. 15, 2003) ........................... 4, 5

Daubert v. Merrell Dow Pharms., Inc.,
  509 U.S. 579 (1993) .............................................................................................. 1, 2, 22

Gen. Elec. Co. v. Joiner,
  522 U.S. 136 (1997) ........................................................................................................ 1

Guy v. Crown Equip. Corp.,
  394 F.3d 320 (5th Cir. 2004) ........................................................................................... 2

Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd.,
  34 F.3d 410 (7th Cir. 1994) ........................................................................................... 19

Juicy ZCouture, Inc. v. L'Oreal USA, Inc.,
  04 Civ. 7203  2006 WL 1012939 (S.D.N.Y. April 19, 2006) .......................................... 11

KIS, S.A. v. Foto Fantasy, Inc.,
  204 F. Supp. 2d 968 (N.D. Tex. 2001) ........................................................................... 14

Kumho Tire Co., v. Carmichael,
  526 U.S. 137 (1999) .................................................................................................... 1, 2

Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,
    452 F. Supp. 2d 772 (W.D. Mich. 2006) ......................................................... 11

Powerhouse Marks LLC v. Chi Hsin Impex, Inc.,
    No. 04-73923, 2006 WL 897254 (E.D. Mich. Apr. 5, 2006) ............................. 5

USA Football, Inc. v. Robinson,
    No. H-03-4858, 2004 WL 3363843 (S.D. Tex. Sept. 20, 2004) ....................... 16

Univ. of Kansas v. Sinks,
    No. 06-2341-JAR, 2008 WL 755065 (D. Kan. Mar. 19, 2008) ..................... 5, 8, 9, 10, 11

Vista Food Exch., Inc. v. Vistar Corp.,
    No. 03-CV-5203DRHWDW, 2005 WL 2371958 (E.D.N.Y. Sept. 27, 2005) .............. 5, 16

## Statutes

15 U.S.C. § 1125(a)(1)(A) ........................................................................ 6, 7, 8, 9

Federal Rules of Evidence
    Rule 104(a) ................................................................................ 3, 4
    Rule 401 .................................................................................... 2, 3
    Rule 402 .................................................................................... 2, 3
    Rule 702 .................................................................................... 2, 3

## Other Authorities

Larry C. Jones, Developing and Using Survey Evidence in Trademark Litigation,
    19 Mem. St. U. L. Rev. 471 (1989) ................................................... 22

J. Thomas McCarthy,
    McCarthy on Trademarks and Unfair Competition § 15:11 ............................ 16

Shari Seidman Diamond, Reference Guide on Survey Research,
    869 PLI/Pat 329, 266 (2006) ......................................................... 21, 22

## PRELIMINARY STATEMENT

Plaintiffs/Counterclaim Defendants Dallas Cowboys Football Club, Ltd. ("Cowboys") and NFL Properties, LLC ("NFLP") submit this brief in support of their motion to exclude the testimony of purported "expert" James T. Berger ("Mr. Berger" or "Berger"), including any affidavits or reports proffered by Defendant/Counterclaimant America's Team Properties, Inc. ("ATP"), for all purposes, including summary judgment and trial.[1] Lacking a fundamental understanding of the principal legal issue of likely confusion and without any knowledge whatsoever of post-sale confusion, (Appx. 127 (Berger Dep.) at p.21 ("I don't know what it is."), Mr. Berger is not qualified to rebut Plaintiffs/Counterclaim Defendants' expert Gabriel M. Gelb ("Mr. Gelb" or "Gelb"), nor to proffer survey evidence of his own. Mr. Berger's opinions are thus unreliable and irrelevant and should not form part of the record evidence in this case. See Fed. R. Evid. 401, 402, 702 (the "Federal Rules").

## ARGUMENT

The Supreme Court has exhorted trial courts to scrutinize expert testimony and to exclude unreliable expert evidence. Kumho Tire Co., v. Carmichael, 526 U.S. 137, 147-49 (1999); Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-42 (1997). Under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), the district courts must act as "gatekeepers" with respect to expert testimony in order to ensure that speculative or unreliable expert testimony does not reach the fact finder. The guidelines from Daubert are equally applicable to testimony based on scientific, technical, or other specialized knowledge. See Kumho Tire, 526 U.S. at 147-49. By virtue of

---

[1] The Declaration of Robert L. Raskopf is being filed in support of Plaintiffs/Counterclaim Defendants' Motion to Exclude. The following, which Mr. Berger has already submitted, should be excluded, as should all future related oral or written testimony: Report of James T. Berger, Appx. 3-31 ("Berger Report" or "Berger Rep."), Supplemental Report of James T. Berger, Appx.32-40 ("Berger Supp. Report" or "Berger Supp. Rep."), Research Report of James T. Berger, Appx. 41-125 ("Berger Research Report" or "Berger Research Rep."), and Mr. Berger's deposition testimony, Appx. 126-272 ("Berger Dep.").

their "gatekeeping" role, district courts must weed out those proposed expert witnesses who are in fact *not* qualified to present testimony based on specialized knowledge. <u>See</u> Fed. R. Evid. 702; <u>Guy v. Crown Equip. Corp.</u>, 394 F.3d 320, 325 (5th Cir. 2004); <u>Castellow v. Chevron USA</u>, 97 F. Supp. 2d 780, 783 (S.D. Tex. 2000).

In addition to the Supreme Court's mandate as to the reliability of expert evidence, such evidence must also satisfy the basic standards of relevance set forth in the Federal Rules. <u>See</u> Fed. R. Evid. 401, 402. Rule 402's explicit statement that "[e]vidence which is not relevant is not admissible," Fed. R. Evid. 402, is echoed in <u>Daubert</u>'s requirement that the expert evidence be "relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 580, 591; <u>see</u> <u>Bocanegra v. Vicmar Servs., Inc.</u>, 320 F.3d 581, 584 (5th Cir. 2003). Rules 402 and 702 together operate to weed out expert testimony that is not sufficiently tied to the facts of the case in order to assist the fact finder in the resolution of factual disputes. <u>See</u> <u>id</u>.

Berger should not be permitted to testify because, fundamentally, he completely lacks an understanding of trademark confusion. He has no foundational knowledge of confusion as a legal principle and certainly no expertise in designing or conducting surveys to test this concept (or even modifying the surveys of others as he claims to have done here). As to the specific issue of post-sale confusion, explored by Mr. Gelb's studies and thus the basis for Berger's own survey modeled upon Gelb's, Mr. Berger admits to never having heard of post-sale confusion. (Appx. 127 (Berger Dep.) at p.21 ("No, I really don't [know what post-sale confusion is]. Why don't you explain that to me. . . . I don't know what it is.")).

Mr. Berger's failure to comprehend the general concept of confusion and his resulting incapacity to construct surveys capable of yielding data relevant to the legal issues at bar have led other courts to exclude and soundly criticize Mr. Berger's studies as unreliable. Likewise,

this Court should not admit into evidence the self-contradicted and refuted rebuttal testimony and affirmative evidence proffered by Mr. Berger in this matter. His opinions are unreliable and irrelevant and should be excluded. See Fed. R. Evid. 104(a), 401, 402, 702.

## I. THE COURT SHOULD PRECLUDE BERGER FROM SERVING AS AN EXPERT BECAUSE HE IS NOT QUALIFIED

### A. Berger Does Not Understand and Is Not Qualified to Provide an Expert Opinion on the Issue of Likely Confusion

Berger possesses no understanding of the basic principle of likely confusion nor the function and design of trademark surveys aimed at testing for trademark confusion. He admittedly does not even know what post-sale confusion is. (Appx. 127 (Berger Dep.) at p.21 ("No, I really don't. Why don't you explain that to me.")). Lacking this rudimentary foundation, he did not, and does not, comprehend the framework within which Mr. Gelb designed and conducted his studies and thus the framework within which he was to critique Mr. Gelb's analysis or analyze the data from his own survey, which he claims he designed to replicate Mr. Gelb's, (id., Appx. 56 (Berger Research Rep.), p. 16). As discussed in more detail *infra* (Section II.A.), Mr. Berger erroneously interpreted Mr. Gelb's studies to be secondary-meaning surveys only. This incorrect conclusion reflects Mr. Berger's absolute lack of understanding of the legal issues that were tested by both Mr. Gelb ***and himself***. Without the necessary comprehension of the gravamen of the case, Mr. Berger is not qualified to analyze the design or the results of any survey conducted in this matter, nor to analyze the applicability of such data to the legal issues at bar. See Fed. R. Evid. 104(a) (qualifications of purported expert are threshold factor for judicial determination).

Illustrative of Mr. Berger's ignorance of how the survey data applies to the relevant issues is his utter inability to explain why he included in his study the question "Which team in particular do you believe the words America's Team [] refers to?" (Appx. 73 (Berger Research

Rep.), p. 33 (Question No. 9) (not present in the Gelb survey that Berger was replicating); see id., Appx. 154 (Berger Dep.) at 156). Berger's deposition testimony on this point, "I don't know. . . . No particular reason. . . . It has no bearings [sic]on the results. . . . ," (id. at 156-57), is telling and speaks volumes about his inability to serve as a trademark-survey expert. He cannot understand even that part of a survey that he independently crafted, let alone the questions authored by Mr. Gelb.

### B.      Berger Has Scant Experience in Surveys for Trademark Litigation

Mr. Berger is also unqualified because he lacks significant experience with trademark surveys for litigation. "[A] journalist by training" with an early career in advertising, (id. at 42; see id. at 36-46 (quoted language at 45); id., Ex. 1 (Berger Rep.), Ex. A; id., Ex. 3 (Berger Research Rep.), Ex. A), for the first thirty-three years of his business life, Mr. Berger did not construct or critique any trademark or sports-merchandising surveys, (id., Appx. 129-130 (Berger Dep.) at 35, 38). During this entire period spanning over three decades, Mr. Berger's work did not even involve a single such study. (Id. at 36 ("I didn't do any work in that [trademark] area at all.")). His written contributions to the trademark field have been primarily for a single publication, IP Today Magazine, and *never* for any academic research journal or The Trademark Reporter, the official law journal of the International Trademark Association. (Id. at 63).

Mr. Berger describes his profession as "integrated marketing communications," (id. at 46), as opposed to consumer-market research or trademark-litigation surveys. He is a jack of all trades, who proffers testimony on many non-trademark matters, id. at 54 (buyer behavior, trade secrets, advertising liability, domain-name high jacking); see Continental Air Cond., Inc. v. Keller Const. Co., No. B142230, 2003 WL 22120886 (Cal. App. 2 Dist. Sept. 15, 2003) (Berger served as expert on the issue of contract damages).

Other courts have excluded prior trademark studies designed and conducted by

Mr. Berger as "flawed to the point that [the] probative value is substantially outweighed by the

survey's potential for unfair prejudice and confusion." <u>Vista Food Exch., Inc. v. Vistar Corp.</u>,

No. 03-CV-5203DRHWDW, 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005); <u>see also</u>

<u>Powerhouse Marks LLC v. Chi Hsin Impex, Inc.</u>, No. 04-73923, 2006 WL 897254 (E.D. Mich.

Apr. 5, 2006). Berger's methodology has also been criticized as "significant[ly] flaw[ed],"[2]

<u>Univ. of Kansas v. Sinks</u>, No. 06-2341-JAR, 2008 WL 755065, at *5 (D. Kan. Mar. 19, 2008),

and lacking in thoroughness, <u>Continental Air Cond.</u>, 2003 WL 22120886. Just as these courts

have found Mr. Berger's work to be sub-par and unreliable, so this Court should similarly find

and should exclude all testimony and related reports proffered by Defendant/Counterclaimant's

proposed "expert."

## II.     BERGER'S CRITICISMS OF MR. GELB'S SURVEY DESIGN ARE UNRELIABLE AND IRRELEVANT

### A.     <u>Berger Lacks the Understanding with Which to Critique or Conduct a Likely-Confusion Study</u>

Mr. Berger simply does not comprehend the legal issues against which he was to critique

Mr. Gelb's secondary-meaning and likely-confusion studies and to design a like survey of his

own. As Berger himself cautions: "Do not expect your survey expert to be knowledgeable about

the legal issues of the case. That is the task of the attorney." (Appx. 328 (James T. Berger,

"How To Do An IP Survey Without Giving Away The Store," <u>Intellectual Property Today</u>,

April 2008). True to his word, Mr. Berger agreed to be retained by Defendant/Counterclaimant

---

[2]  Curiously, at his deposition, Mr. Berger denied having been the subject of judicial criticism in the <u>University of Kansas</u> case, (Appx. 136, 142-143 (Berger Dep.) at 66-67, 94, 97), even going so far as to proclaim that the court "basically . . . thought that the survey had merit. . . . " (<u>Id</u>. at 66). Mr. Berger's rose-colored glasses could certainly do with a new prescription.

despite having no understanding of how to frame, or interpret, survey questions designed to elicit respondents' perceptions as to source or sponsorship confusion.

Mr. Gelb crafted a questionnaire that tracked the language of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), almost verbatim.  Berger's failure to recognize the Gelb surveys as confusion studies is not surprising given that Berger has never read Section 43 of the Lanham Act, (Appx. 139 (Berger Dep.) at p.80), and does not consider himself to be "in a position to interpret the Lanam [*sic*] Act," (Appx. 140 (Berger Dep.) at p.84 ("I am just not qualified in this area.")).  Section 43(a) sets forth three independently actionable forms of trademark confusion: confusion as to the (1) "origin"; (2) "affiliation," "connection," "association," or "sponsorship"; and (3) "approval" of a defendant's product.  15 U.S.C. § 1125(a)(1)(A).  Mr. Gelb painstakingly designed his studies to mirror these three types of confusion:

- Question Nos. 2-6 asked about the "origin" of the displayed cap, using the words "puts out," (Appx. 279 (Expert Report of Gabriel M. Gelb ("Gelb Rep.")p. 7; id., Ex. C, pp. 8-12); see 15 U.S.C. § 1125(a)(1)(A);

- Question Nos. 7-12 asked about "affiliation," "connection," "association," or "sponsorship," using the words "affiliated or connected," (Appx. 280 (Gelb Rep.), p. 8; id., Ex. C, pp. 13-18); see 15 U.S.C. § 1125(a)(1)(A);

- Question Nos. 13-18 asked about "approval," substituting the word "permission," (Appx. 280 (Gelb Rep.), p. 8; id., Ex. C, pp. 19-24); see 15 U.S.C. § 1125(a)(1)(A).

It is difficult to conceive of survey language that could more closely replicate that of the relevant, governing Lanham Act provision.  Yet somehow Mr. Berger maintains that Mr. Gelb's studies were secondary-meaning surveys *only* and shed no light on the issue of confusion.  (Id.,

Appx. 127, 139, 141 (Berger Dep.) at 22, 80, 87-88; id., Appx. 11 (Berger Rep.), p. 9). At his deposition, when reading Section 43(a) of the Lanham Act for the first time in his professional career, (id., Appx. 139 (Berger Dep.) at 80), and thus finally encountering its language as to the different forms of trademark confusion, Mr. Berger conceded that Mr. Gelb's question as to who "puts out" the cap, (id., Appx. 279 (Gelb Rep.), p. 7; id., Ex. C, p. 8 (Question No. 2)), may result in useful information on the issue of source confusion. (Id., Appx. 140 (Berger Dep.) at 83 ("Possibly, yes. . . . That's right.")).

Incapable as he is of recognizing the difference between Mr. Gelb's single secondary-meaning question (Question No. 1: "What, if anything, do you think of when you see the words 'America's Team'?"), (id., Appx. 279 (Gelb Rep.), p. 7; id., Ex. C, p. 8), and the confusion series, and thus of assessing the results generated from the confusion questions,[3] Mr. Berger is not qualified to offer testimony. Where an expert so thoroughly misunderstands the legal concepts at issue, any proffered testimony related thereto is patently unreliable.

### B.   Berger's Criticisms of the Internet are Belied by His Own Words and Work

Berger's strained critique of the online format of Mr. Gelb's surveys is belied by *his own writings* and cited sources and *his own practices*. Indeed, Mr. Berger unabashedly touts online research as "combin[ing] the best of both worlds [telephone and mall-intercept]." (Id., Appx. 330 (James T. Berger, "The Power and Perils of Internet Surveys," Intellectual Property Today, August 2007), p. 2). He advocates internet studies that use opt-in panels similar to that employed by Mr. Gelb: "Research shows 'conducting surveys on the web has proven to be just

---

[3]   Indeed, Mr. Berger essentially ignored the empirical evidence generated by the majority of Mr. Gelb's questions relating to confusion, as Berger – unlike Mr. Gelb – considered only the first two questions to be "seminal" and "key." (Appx. 141 (Berger Dep.) at 88; see id., Ex. 1 (Berger Rep.), p. 9). Such admittedly deliberate blindness to much of the raw data from Mr. Gelb's studies compromises Mr. Berger's ability to issue any sort of meaningful critique of the empirical proof.

as effective as other methods. . . . ' " (Id., p. 2 (quoting "Why Online?: New Benefits and Possibilities," MarketTools White Paper, April 26, 2005 (hereinafter "MarketTools White Paper")) (Appx. 332-335) (emphasis added)).  Mr. Berger goes on to offer specific proof of the reliability of online research:  " 'A number of studies have shown that data collected via the web very closely matches data collected through other media.  In a study conducted for MarketTools clients in 2004, we compared the results of 90 concept tests.  The results . . . indicate a very strong correlation between on-line and off-line scores.' " (Id.).

Moreover, if actions speak louder than words, Berger himself has conducted two internet studies for testing basic, generally used products or services.  (Id., Appx. 135-136 (Berger Dep.) at 64-67 (in University of Kansas, Berger conducted an online test of t-shirts with writing); id. at 67-71 (in another internet study, Berger surveyed "ordinary customers" who use banking services) (quoted language at 70)); see Univ. of Kansas, 2008 WL 755065, at *2.  Further underscoring the propriety of Mr. Gelb's methodology, Berger also testified at his deposition that for work he is doing in another matter, he intends to use the same online-panel provider employed by Mr. Gelb here.  (Appx. 139 (Berger Dep.) at p.78).

Thus, contrary to the position he takes in this case, Mr. Berger endorses internet-based survey research as representative and unbiased,[4] indeed "more" so than other offline data-

_____

[4]  On the issue of perceived bias, any potential for bias that Mr. Berger suggests may have arisen from Mr. Gelb's lack of screening questions to weed out those persons who frequently take surveys and those who are employed in, or have a family member working in, certain fields is but a smokescreen.  As a threshold matter, Mr. Berger concedes that he simply does not know if the subcontractor company whose panel Mr. Gelb used *did or did not* impose controls against frequent survey takers.  (Appx. 147 (Berger Dep.) at 117).

In any event, not only, as Berger has himself acknowledged, does online research present reduced bias overall, (id., Appx. 330 (Berger, "The Power and Perils of Internet Surveys"), p. 2), and certainly so here where Mr. Gelb surveyed such a large pool –1200 respondents nationwide – but the nature of Mr. Gelb's questions also renders the issue of bias irrelevant.  It is impossible to conceive of how any respondent, even one with a proclivity for online or other surveys, could ascertain what answers this survey was seeking.  Open-ended questions such as "What, if anything, comes to your mind when you see the words 'America's Team'?" and "Which organization puts out this cap or don't you know?," (id., Appx. 278-279 (Gelb Rep.), pp. 6-7; id., Ex. C, pp. 7, 8 (Questions 1, 2)), do (footnote continued)

collection methods. (Id., Appx. 330 (Berger, "The Power and Perils of Internet Surveys"), p. 2 (it " 'offers . . . less biased responses [and a] more representative sample' " than offline techniques) (quoting MarketTools White Paper (Appx. 332-335)). The MarketTools White Paper on which Mr. Berger so heavily relies states that the internet increasingly reflects the United States ("U.S.") general population, as more than seventy-five percent (75%) of U.S. households are online (in 1995). (Id., Appx. 334 (MarketTools White Paper), p. 2). Berger testified that today the percentage of internet users over the age of eighteen is eighty percent (80%). (Id., Appx. 147 (Berger Dep.) at 117).

As to perceived bias from comparatively lower response rates (relative to offline research), not only has Mr. Berger himself stated that "*despite* low response rates," internet surveys are just as "effective" as other techniques, but he also identifies non-responsiveness in terms of a range of half-of-one percent (.5%) to two percent (2%). (Id., Appx. 330 (Berger, "The Power and Perils of Internet Surveys"), p. 2 (emphasis added)). That problematic range is in keeping with the response rate (2.16%) for which Berger's own study was criticized in Univ. of Kansas as biased and methodologically unsound, Univ. of Kansas, 2008 WL 755065, at *4-*5, and is in marked contrast to the ten-percent (10%) response rate of the Gelb surveys, (Appx. 324 (Deposition of Gabriel M. Gelb, April 8, 2008 ("Gelb Dep.") at p.68)). The response rate garnered by Mr. Gelb's studies is approximately five times that cited by Mr. Berger in his writings as problematically low. (Id., Appx. 144 (Berger Dep) at 108). Significantly, even if Mr. Gelb had not achieved such a high acceptance rate, Mr. Berger has himself tellingly acknowledged that a "low response rate does not necessarily invalidate [a] study." (Id. ("No, it

---

not give anything away and thus do not lend themselves to strategic guessing or gamesmanship. (Id., Appx. 145 (Berger Dep.) at 110-111 (conceding that a desire to please the survey giver does "not [have] really very much" (footnote continued)

doesn't."). This aspect of Berger's criticism is thus intrinsically incredible, irrelevant, and unreliable.

In sum, Mr. Berger's own admissions, his own use of the internet in similar cases, his own writings touting online research, and his heavy reliance on the MarketTools White Paper study advocating internet studies render it difficult to take Mr. Berger's professed anti-internet verbiage at face value. His testimony on this subject is thus wholly unreliable and should not be admitted. Berger is exactly the type of witness <u>Daubert</u> is designed to weed out: one who says whatever he deems beneficial to his client at the time in question.

### C.    A Mall-Intercept Study Is Not Appropriate Here

Similarly suspect and unreliable in view of the blatant transparency behind Mr. Berger's criticisms of the internet format of the Gelb surveys are Berger's related arguments in favor of a mall-intercept technique. First, as discussed *supra* and as endorsed by Mr. Berger himself, the internet wields many advantages over conventional mall-based research. Second, Mr. Berger ignores that the relevant marketplace here is ***not*** people who shop in retail stores, in malls or elsewhere. As ATP's products have been offered for sale almost exclusively ***over the internet and not at the retail level***, Berger demonstrates his utter miscomprehension of the relevant marketplace in suggesting that respondents must see the physical item.[5] His misconception is

---

bearing on Gelb's study) (quoted language at 111)). Given the design of Mr. Gelb's questionnaire, Mr. Berger's criticisms as to potential bias are particularly inapt and meritless.

[5] Similarly erroneous given the facts of this case is Mr. Berger's position that a side-by-side display is the proper survey format. Showing respondents an array in which Plaintiffs/Counterclaim Defendants' and Defendant/Counterclaimant's products are displayed next to each other *in no way* replicates the manner in which ATP's goods have been offered for sale in the past – namely, from ATP's website, which features *only* ATP's items, not officially licensed NFL Cowboys merchandise. (<u>See</u> Appx. 143 (Berger Dep.) at 99-100 (Berger's lack of familiarity with ATP's website)). The Court should ignore this off-base criticism of Mr. Gelb's studies, as did the court in <u>Univ. of Kansas</u> (much as Berger would have it otherwise, (<u>see</u> id. Appx. 136, 142-143 p.66-67, 94, 97)), except to the extent that it further illustrates Mr. Berger's failure to understand the issues at play and their relation to the facts. See <u>Univ. of Kansas</u>, 2008 WL 755065, at *5 (Berger criticized for side-by-side display because it did not mirror the marketplace).

(footnote continued)

explained by the shocking fact that he has no memory of *ever having seen* Defendant/Counterclaimant's website offering products for sale prior to his deposition. (Id. at 99-100 ("I can't recall.")).

Third, there is absolutely nothing about the cap being tested that requires physical inspection and that thereby renders Mr. Gelb's internet surveys inappropriate. Just as in Univ. of Kansas, there is no relevant legal issue involving an interior label, an insignia on the back of the cap, or the quality of any aspect of the product. Further, to the extent that Gelb's studies serve to measure post-sale confusion, where the perceptions of persons encountering the product after its purchase are at issue and where the cap would not be handled by third-party observers, the photographic image used by Mr. Gelb properly simulates the post-sale viewing context. At bottom, this action centers on the words "America's Team" – consumer recognition of that term and confusion emanating from Defendant/Counterclaimant's misuse of that designation. Nor does Mr. Berger maintain, as he cannot, that the lettering on the caps (test and control) were in any way illegible in the online photographs shown to respondents in Mr. Gelb's surveys.

Finally, Mr. Berger embraces yet another inherently inconsistent position in maintaining that a mall-intercept format is the most appropriate here and at the same time positing that various teams around the U.S. have been associated with the "America's Team" moniker. If, as

---

Indeed, Mr. Berger's erroneous conception of what it means to simulate the shopping experience speaks volumes about his general unsophistication in trademark-litigation surveys. (See Appx. 142-143 (Berger Dep.) at 94-97). For Berger, "simulat[ing] a shopping experience" means simply lining up products as one might see them in a store, *irrespective* of whether the particular products at issue would ever be sold at the same store and hence ever displayed together. (Id. at 96-97 (quoted language at 96)). His aim is to replicate a *general* shopping experience, rather than, as trademark law requires, the *specific* purchasing conditions that consumers of the defendant's products would experience, see Juicy ZCouture, Inc. v. L'Oreal USA, Inc., 04 Civ. 7203 (DLC), 2006 WL 1012939, at *25 (S.D.N.Y. April 19, 2006); Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 452 F. Supp. 2d 772, 784 (W.D. Mich. 2006). (Raskopf Decl., Ex. 4 (Berger Dep.) at 96-97). Mr. Berger's consistent failure to tailor his surveys to the facts of the case at hand renders his criticism of the internet format selected by Mr. Gelb ill-conceived and unreliable. Indeed, Mr. Berger's profound misconception of, and persistent and deliberate inadherence to, one of the (footnote continued)

he would have it, devotees of sports entities other than the Dallas Cowboys have considered the title "America's Team," to include the Atlanta Braves, the Boston Red Sox, the New England Patriots, and the Olympics, then the localized nature of a mall-intercept study is particularly inappropriate for this case.[6]

For all the foregoing reasons, Mr. Berger's testimony as to the preferability of mall-intercept research is unreliable and should be excluded.

### D.    Berger Misunderstands What Is a Proper Control

Berger improperly selected as a control (to filter out those respondents with non-trademark rationales for identifying the mark AMERICA'S TEAM with the Dallas Cowboys) a designation that might in certain contexts *itself* constitute an infringement of Plaintiffs/Counterclaim Defendants' AMERICA'S TEAM trademark.  While the goal of a control is to come fairly close to the mark at issue so as effectively to weed out "noise" in a meaningful way, a control may not, as does the NATION'S TEAM designation chosen by Mr. Berger, itself cross the line into confusing similarity.  As stated by Shari Seidman Diamond in a passage quoted liberally by Mr. Berger in his "expert" reports here, the purpose of a control is to eliminate responses that derive from "sources other than the trademark the respondent is being shown" and thus enable the survey expert to "test directly the influence of the stimulus."

---

fundamental underpinnings of a reliable trademark survey – attention to the actual marketplace environment – bespeaks his utter lack of qualification as an expert witness in this matter.

[6] As discussed *infra*, Section III.A., Mr. Berger – after having expressed criticism of Mr. Gelb when he mistakenly thought that Mr. Gelb had chosen the Dallas market as one of five test markets nationwide (which Mr. Gelb had not done) – intentionally selected to survey respondents in malls in Atlanta, Georgia (home to the Atlanta Braves) and Boston, Massachusetts (the home area of both the Boston Red Sox and the New England Patriots).  (Appx. 149 (Berger Dep.) at 133-34 ("I felt those markets should be represented.") (quoted language at 134)).  Berger also chose to test in Colorado Springs, Colorado (where the U.S. Olympics Committee is headquartered) and not at all in Dallas, Texas or, indeed, anywhere in Texas, any of its neighbor states, or anywhere in the Southwest.  (Id., Ex. 3 (Berger Research Rep.), p. 6).  In so doing, Berger impermissibly biased and skewed his survey results, which, together with his own related criticism of Mr. Gelb (based on Berger's then-misunderstanding of Mr. Gelb's nationwide study as having included Dallas, Texas ), demonstrates the impropriety (footnote continued)

(Id., Appx. 49 (Berger Research Rep.), p. 9 (quoting Shari Seidman Diamond, <u>Reference Guide on Survey Research</u> § F)).

The NATION'S TEAM control fails in this regard as it is too close to the AMERICA'S TEAM trademark to eliminate the possibility that control respondents are naming the Dallas Cowboys because of a perceived association between the name NATION'S TEAM and the mark AMERICA'S TEAM. It is far from clear that a non-trademark rationale underlies answers associating the Dallas Cowboys with the name NATION'S TEAM. Indeed, a review of the explanatory answers provided by control respondents in Mr. Berger's study, which employed the NATION'S TEAM control, would suggest just the opposite. (Id., Appx.160-162 (Berger Dep.) at 183-85, 188-90; Exs. IIII, JJJJ). Several of Berger's respondents named the Cowboys when shown the control precisely because of a belief that the NATION'S TEAM designation *was itself* the AMERICA'S TEAM trademark. (Id. at 186, 189; <u>see</u>, <u>e.g.</u>, <u>id.</u>, Ex. JJJJ (respondent no. 25: "[The Cowboys] have always been considered the nation's team America's team.")). In Mr. Berger's own words: "[T]hey are confused, they think the Nation's Team and America's Team might very well be the same thing." (Id. at 189; <u>see</u> <u>id.</u> at 186).

Mr. Berger intentionally violated a fundamental rule of trademark-survey controls, namely that the control designation not have any words in common with the tested mark. <u>See</u> <u>Classic Foods Int'l v. Kettle Foods, Inc.</u>, No. SACV 04-725 CJC (Ex), 2006 WL 5187497, at *4 (C.D. Cal. March 2, 2006) ("The control should have as many characteristics in common with the 'experimental stimulus' . . . as possible, except for the characteristic whose influence is being tested."). Quite to the contrary, Berger considers the NATION'S TEAM control to be "such a good control," *because* Nation's Team is "[]n[o]t that far apart conceptually from America's

---

of mall-intercept research here. On the facts of this case, the localized nature of mall-based surveys renders such
(footnote continued)

Team." (Appx. (Berger Dep.) at p.186). As such, Berger's proposed control does not enable him properly to focus on the impact of the AMERICA'S TEAM stimulus, (see id. at 183-86, 188-90, Exs. IIII, JJJJ), thereby contravening established survey-control methodology, as articulated by Ms. Diamond and cited by Mr. Berger in his own reports, (see id., Appx. 15-16 (Berger Rep.), pp. 13-14 (quoting Diamond, Reference Guide § F); id., Appx. 49 (Berger Research Rep.), p. 9 (quoting Diamond, Reference Guide § F)).

By contrast, Mr. Gelb's choice of the phrase THE BEST to tease out "noise" satisfies accepted control criteria, including that relied on by Mr. Berger. Id. Berger's criticism of the Gelb control as inadequate because of the low numbers it generated is nonsensical; a control need not yield high percentages to be accurate. AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 613-14 (7th Cir. 1993) (7% noise from control group); KIS, S.A. v. Foto Fantasy, Inc., 204 F. Supp. 2d 968, 971 (N.D. Tex. 2001) (7.1% noise from control group). Mr. Berger is placing the proverbial cart before the horse and judging the control from its results. He has misunderstood the very passage he quotes, in which Ms. Seidman articulates a cogent explanation of survey controls. (Appx. 15-16 (Berger Rep.), pp. 13-14 (quoting Diamond, Reference Guide § F)). Mr. Berger's misunderstanding of the basic nature of a survey control renders his testimony on this point unreliable and inadmissible and, as discussed *infra*, taints the results generated by his own study, which employed the improper NATION'S TEAM control.

### E.    Gender is a Non-Issue Here

Mr. Berger's criticisms of the gender quota in the Gelb studies are belied by the data generated by his own survey. The results of the Berger survey demonstrate a gender division of sixty-one percent (61%) male/thirty-nine percent (39%) female, from an "unbiased selection

_____

method of data collection wholly improper.

process."[7]  (Id., Appx. 52 (Berger Research Rep.), p. 12; see id., Appx. 138-139 (Berger Dep.) at 76-77 ("[T]hat is how it fell. . . .  It was random. . . .  It was just a matter of going through the screening process and qualifying.")).  This breakdown aligns very closely with the seventy percent (70%) male/thirty percent (30%) female quota sought by Mr. Gelb and is thus also in keeping with the research on which Mr. Gelb relied in imposing his quota, (id., Ex. 5 (Gelb Rep.), Ex. B (*The Harris Poll* #95, October 1, 2007 ("men (63%) are more likely to follow professional football than women (37%)")).[8]  (Id., Appx. 139-140 (Gelb Dep.) at 79-81).  As such, Mr. Berger's testimony on the gender division is irrelevant,[9] and the Court should not admit it.

## III.   BERGER'S SURVEY AND REPORT ARE UNRELIABLE AND IRRELEVANT

As a threshold matter, for the reasons discussed in Sections II.A., C., and D. *supra*, the affirmative study submitted by Defendant/Counterclaimant and designed and conducted by Mr. Berger is fundamentally flawed and should not be admitted.  Without any understanding of what survey questions addressing likelihood of confusion even look like, Mr. Berger is not equipped to field a study that employs such questions.  (See id., Appx. 127 (Berger Dep.) at 22 (proclaiming that his survey, modeled after Gelb's, did not "measure confusion"); see also id. at 80, 87-88; id., Appx. 11 (Berger Rep.), p. 9).  Even as to questions relating to secondary

---

[7]   Berger, however, provides no information as to any method for gender selection in his study.  He did not supply any instructions on this subject to the interviewers, leaving them free to select for questioning as many males or females as they saw fit.  The absence of any directives to the field concerning gender selection is a fundamental survey flaw.

[8]   Berger considers the Harris Poll, as a probability study, to be "projectable on the entire population of the United States."  (Appx. 146 (Berger Dep.) at 115).

[9]   Mr. Berger also took meaningless issue with Mr. Gelb's editorial decision not to include the gender quota in his expert report and has similarly criticized Mr. Gelb for seemingly misreporting the age minimum required of respondents.  As Mr. Gelb's report accurately represented the age of respondents as eighteen years and older (the fifteen-to-seventeen-year-old spread referenced by Mr. Berger derived from correspondence between Mr. Gelb and his subcontractor panel provider and was never implemented, (see Appx. 139 (Berger Dep.) at 77-78)), such criticisms as to improper reporting are admittedly meritless and thus irrelevant and unreliable.

meaning, Mr. Berger is ignorant and incapable of undertaking any meaningful analysis.[10] (Id., Appx. 154-155 (Berger Dep.) at 156-58 ("I don't know.") (quoted language at 156)).  He thus contradicts his own primary rule of survey construction that it is necessary to "[d]etermine precisely what you want to prove."  (Id., Appx. 336 (James T. Berger, "Swimming in Shark-Infested Waters," Intellectual Property Today, June 2004), p. 1 ("If it is a *likelihood of confusion* case, make sure you can articulate what you believe are the elements of confusion and why.") (emphasis in original)).

Moreover, as the control selected and employed by Mr. Berger is flawed, the data from Mr. Berger's study contain inflated noise levels and bias the entirety of the survey, which should be excluded for that reason alone – a faulty control being tantamount to no control at all.  See Vista Food Exch., 2005 WL 2371958 (Berger study inadmissible because it lacked a control). Additionally, Berger's survey suffers from other striking flaws that mandate its preclusion.

A.      **Berger's Survey, *Not Gelb's*, Suffers from Irredeemable Geographic Bias**

In a further act of contradiction, see Section II.C. *supra*, while claiming that Mr. Gelb's national survey suffered from geographic bias,[11] Mr. Berger improperly designed his own survey in a localized and prejudicial manner.  When Mr. Berger was under the mistaken impression that

---

[10]  Berger is not only unable to explain why he included in his study the question "Which team in particular do you believe the words America's Team [] refers to?," (Appx.  (Berger Research Rep.), Ex. C, p. 33 (Question No. 9 (not present in the Gelb survey that Berger was replicating)); see id., Ex. 4 (Berger Dep.) at 156), but he is also equally incapable of explaining the overall classification process he employed to gauge secondary meaning and reach his purported "expert" conclusions, (id. at 157-59).  "I don't know. I really don't know." (Id. at 159).

[11]  Mr. Berger also criticized the Gelb study that measured the perceptions of respondents in the Dallas/Forth-Worth consolidated metropolitan area ("Dallas study") as being improperly localized.  It is difficult to understand how a survey that centers on the specific locale where the Dallas Cowboys are based and play their home games lacks relevance to the issues before the Court (and certainly so for secondary meaning, where it is the recognition of the plaintiff's consumer base that is measured, see USA Football, Inc. v. Robinson, No. H-03-4858, 2004 WL 3363843, at *9 (S.D. Tex. Sept. 20, 2004); J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:11).  Furthermore, the Dallas study serves also to validate the results of the nationwide study in providing a frame of reference against which to evaluate the national data.  (See Appx. 132, 134 (Gelb Dep.), at 45-46, 55-56).  Thus, this aspect of Mr. Berger's geography-focused criticisms is misplaced and should not be allowed.

Mr. Gelb's national study comprised five markets, one of which was Dallas, Texas,[12] Berger pronounced the Dallas participants in Mr. Gelb's national study to be "clearly geographically biased," (Appx. (Berger Rep.), p. 6). "Clearly these individuals are not only biased but should be excluded from taking any kind of a national survey on the subject at hand." (Id. at 12).

Mr. Berger has affirmatively stated that "locations of research venues should be selected as not to prejudice results" and has stressed that "every attempt throughout the planning and execution of the survey should be designed to eliminate bias. Obvious bias will jeopardize the value of the survey." (Id., Appx. 341 (James T. Berger, "10 Easy Ways To Blow Away A Survey," Intellectual Property Today, January 2007), p. 2).

Interestingly and fittingly, Mr. Berger's words now come back to haunt him as his own study suffers from irredeemable geographic bias. Berger surveyed respondents at five U.S. malls, including Atlanta, Georgia and Boston, Massachusetts, fully cognizant that these locations are home to, respectively, the Atlanta Braves and the Boston Red Sox and New England Patriots – entities that Defendant/Counterclaimant claims to have been associated with the moniker "America's Team."[13] (Id., Appx. 149 (Berger Dep.) at 133-34). Mr. Berger admits to having intentionally selected Atlanta and Boston, so as to capture the localized, transient perceptions. (Id. at 134 ("I felt those markets should be represented.")). Moreover, Colorado Springs, Colorado, another of the five markets chosen by Mr. Berger for testing, is home to the headquarters of the U.S. Olympic Committee, another entity whose team (Team USA/Olympic

---

[12] In point of fact, respondents for Mr. Gelb's national study were drawn from a fully nationwide online panel, (Appx. 276-278 (Gelb Rep.), pp. 4-6; id., Appx. 321-324 (Gelb Dep.), at 45-46, 49, 55-56, 66), and Mr. Berger has withdrawn his criticism as to this point. (Id., Appx. 128, 145 (Berger Dep.) at 32, 111).

[13] At his deposition, Mr. Berger conceded the distinction between a temporary title, bestowed by fans and media on the high-performing team of the moment ("fleeting, short-lived") and an established, source-signifying brand, developed and marketed by its owner and thus giving rise to trademark rights ("long-lived"). (Appx. 148 (Berger Dep.) at 131-32) (quoted language at 132)).

Games) ATP claims to have been associated with the words "America's Team." While Berger

claims that Colorado Springs was not purposely selected for this reason – "no attempted bias *on*

*that one*" – (id. at 137 (emphasis added)), his professed lack of intent does not alter the

inescapable prejudicial and biasing effect of his choice. Indeed, the "bias intended" by

Mr. Berger in selecting Atlanta and Boston manifests itself in the survey data from those areas.[14]

(Id. at 173-78, see id. at 179 ("I simply would have expected people from Atlanta would have

answered Atlanta Braves."); id. at 180 ("I would imagine those particular people [in Boston]

would think of [the Red Sox and the Patriots]. . . . ")).  Tellingly, Mr. Berger testified that had a

similar percentage of all respondents in Mr. Gelb's nationwide study who associated the name

"America's Team" with the Cowboys been from Dallas, that degree of localized sentiment would

have constituted bias.  (Id. at 113.  Cf. id. at 178 (Atlanta results)).

    Notably, Berger did not select Dallas, Texas as a fielding site, nor any place in Texas, nor

any state neighboring Texas, nor indeed anywhere at all in the Southwestern U.S.  Unlike

Mr. Gelb, Mr. Berger made no attempt to design a study that would be representative of the

entire nation.  Indeed, and again quite telling as to Mr. Berger's overall lack of experience and

qualifications in trademark-survey research, Berger does not even know how the U.S. census

regions are divided and has *never* conducted a study with census regions in mind.  (Id. at

135-36).  Even had he wanted to create a truly nationwide survey – which he admittedly did not

seek here – Mr. Berger would have been methodologically ill-equipped to do so.

    Instead, strategically aiming his survey towards fans of other organizations who lay claim

to the fleeting "America's Team" title and away from fans of the Dallas Cowboys, the rightful

---

[14]  The vast majority of persons identified by Mr. Berger as having named the Atlanta Braves in response to his initial secondary-meaning question were surveyed in Atlanta.  (Raskopf Decl., Ex. 4 (Berger Dep.) at 172-180, Ex. HHHH).

owner of the AMERICA'S TEAM brand, Mr. Berger impermissibly skewed the data to be generated from this localized study.[15] This bias permeates the entirety of Mr. Berger's survey, the results of which and all testimony related thereto should be excluded as unreliable.

### B.   Berger's Survey Improperly Led Respondents Away from Naming the Cowboys

Illustrative of yet another "creative approach" of the survey expert, (Id., Appx. 342 (James T. Berger, "Creativity Key to Executing Toughest IP Survey Projects," Intellectual Property Today, July 2005), p. 1),[16] Mr. Berger crafted his survey instrument so as to point respondents away from the Dallas Cowboys and towards "Don't Know" answers instead. Mr. Berger misleadingly represented in his Research Report that he had completely replicated Mr. Gelb's survey instrument and had tested for secondary meaning by posing to respondents the same question that Mr. Gelb had asked, "What, if anything, comes to mind when you see the words America's Team []?" (Id., Appx. 50 (Berger Research Rep.), p. 10). Instead, however, Berger asked, "What, if anything, comes to your mind *first* when you see the words America's Team []? Please be as specific as possible. *If you don't know, please do not guess, say 'I don't know.'*" (Id., Ex. C, p. 31 (Q1) (emphasis added)).

Mr. Berger illogically and improperly inserted a specific instruction not to guess if the respondent did not "know" the answer to this top-of-mind question. Yet the question does not call for any form of knowledge-based answer; it explicitly asks only for what "comes [in]to [the

---

[15] Admittedly, Mr. Berger is a self-professed master at such strategic survey gamesmanship. He has proclaimed that "[f]avorable research results are generally possible in even the most challenging intellectual property litigation surveys if the attorney is willing to take a broad view of the problem and the marketplace and keep an open mind to the survey expert's creative approaches." (Appx. 342 (James T. Berger, "Creativity Key to Executing Toughest IP Survey Projects," Intellectual Property Today, July 2005), p. 1). Mr. Berger's selection of test sites is indeed one such "creative approach." Id.

[16] Cf. Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd., 34 F.3d 410, 416 (7th Cir. 1994) (Judge Posner describing the "tricks of the survey researcher's black arts").

respondent's] mind." (Id.).  A response of "I don't know" is logically inconsistent with the very

question being asked.  Similarly, there is no "guessing" as to a proper answer.  The question is

subjective in nature; on its face it asks participants simply to provide their thoughts and

impressions regarding the words "America's Team."  In specifically and illogically instructing

respondents not to guess and repeatedly emphasizing the possibility of a "don't know" answer,[17]

Mr. Berger was attempting to direct survey participants to respond "don't know."  This leading

directive amounts to impermissible bias, effectively steering those respondents who believed the

term identified the Cowboys but may not have been absolutely certain of the factual accuracy of

such an association *away from* answering the Dallas Cowboys.[18]

Likewise, Mr. Berger's insertion of the word "first" was designed  to capture non-

trademark responses, (see, e.g., id., Ex. G, pp. 42-46 ("sports," "teamwork")), and provide

respondents with no further opportunity to express a brand-related answer as well.  Such bias

represents a critical flaw in the Berger study, rendering the survey unreliable and inadmissible.

By Mr. Berger's own admission:  "Obvious bias will jeopardize the value of the survey."  (Id.,

Appx. 341 (Berger, "10 Easy Ways To Blow Away A Survey"), p. 2).

### C.  Berger Improperly Biased and Insufficiently Instructed His Interviewers

Violating one of the most basic rules of survey methodology, Mr. Berger failed properly

to "blind" the interviewers administering his study.  The interviewers were informed from

---

[17]  Prior to this problematic question, Mr. Berger had already informed respondents at the outset of the survey that they should not guess and should answer "don't know" when applicable.  (Appx. 71 (Berger Research Rep.), Ex. C, p. 31).

[18]  Mr. Berger injected similar language in Question No. 4 (which question was intended to mirror Mr. Gelb's Question No. 8), providing respondents with the additional instruction "*Please do not guess.*  If you don't know say 'I don't know.' " (Appx. 70 (Berger Research Rep.), Ex. C, p. 32 (emphasis added)).  This leading directive improperly biased respondents by leading those respondents who believed there to be an affiliation between the manufacturer of the cap and the Cowboys but were not absolutely certain *away from* answering the Dallas Cowboys.

Berger's questionnaire which item shown to respondents was the test and which the control.  (Id.,

Appx. 156 (Berger Dep.) at 167; see id., Appx. 71 (Berger Research Rep.), p. 31 (Q1:

"America's Team [*main group*]Nation's Team[*control group*]"), p. 33 (Q9: "Which teams in

particular do you believe the words America's Team [*main group*] or Nation's Team [*control

group*] on the cap refers to?")).  This obvious potential for bias violates basic survey protocols

and poisons the entirety of Berger's study.[19]  See Shari Seidman Diamond, Reference Guide on

Survey Research, 869 PLI/Pat 329, 266 (2006) (requiring the interviewer to be blind to the

sponsor of the survey and its purpose); Castrol, Inc. v. Pennzoil Quaker State Co., No. Civ. A.

00-2511, 2000 WL 1556019, at *11 (D.N.J. Oct. 12, 2000) ("Anonymity of the sponsor is

necessary to avoid bias.").

        Moreover, despite his ***own directive*** to "create detailed, yet easily understood WRITTEN

INSTRUCTIONS to interviewers and supervisors," (Appx. 340 (Berger, "10 Easy Ways To

Blow Away A Survey"), p. 1 (capitalization in original)), Mr. Berger failed to provide a clear

script to his interviewers and their supervisors, nor detailed coding instructions to the tabulation

company he employed.  Mr. Berger never supplied the interviewers with the specific language

they were to use when informing respondents to look at the cap and handle it at will.  (Id., Appx.

157 (Berger Dep.) at 170 ("It doesn't say it verbally per se."); id., Appx. 65-71 (Berger Research

Rep.), Ex. C, pp. 25-31).  Nor do the general instructions provided by Mr. Berger clearly indicate

even that the interviewer should place the cap in the respondent's view or insure that the writing

on the cap is facing and visible to the respondent.[20]  (Id., Appx. 71 (Berger Research Rep.),

---

[19]  Notably, the MarketTools White Paper endorsed by Mr. Berger specifically cites online research for "eliminat[ing]" "interviewer bias" (Appx. 333 (MarketTools White Paper), p. 2).

[20]  Compounding the absence of instructions on this point, neither Mr. Berger nor anyone from his subcontractor mall-research company visited any of the testing locations to observe or direct interviewer performance.  (See Appx. 151 (Berger Dep.) at 143).

p. 31).  Further, and shockingly, Mr. Berger gave no direction to the tabulation house as to how

to code the responses.  (Id., Appx. 152-153 (Berger Dep.) at 148-49).  Nor did he personally

review the data.  (Id.).  Berger thus left the critical question of respondent classification to others,

who received no clear instructions and had no knowledge of the issues to be examined.  (Id.).

 This absence of written instructions not only contravenes elementary survey protocols,

see, e.g., Brooks Shoe Mfg. Co., v. Suave Shoe Corp., 533 F. Supp. 75, 81 (D.C. Fla. 1981),

aff'd, 716 F.2d 854 (11th Cir. 1983) (interview procedure should be "set forth in detail in the

questionnaire" to insure the protocol is "understood and followed"),[21] but also violates Berger's

**own criteria** for reliability.  As Berger has himself stated, "[I]f it can be shown or proved that the

research instructions are inadequate, this could seriously jeopardize the validity and reliability of

the survey."  (Appx. 340 (Berger, "10 Easy Ways To Blow Away A Survey"), p. 1).

Accordingly, the Court should exclude Mr. Berger's invalid and unreliable survey.

**CONCLUSION**

 For all the foregoing reasons, the Court should exclude Mr. Berger's unreliable critique,

study, and related written and oral testimony as classic "junk science" under Daubert, Black v.

Food Lion, Inc., 171 F.3d 308, 314-15 (5th Cir. 1999) (lower court abused its discretion by

admitting expert testimony that utterly lacked reliability and failed to meet Daubert criteria), and

should grant the Cowboys' and NFLP's motion to exclude the expert evidence propounded by

Defendant/Counterclaimant.

---

[21]  See also Shari Seidman Diamond, Reference Guide, 869 PLI/Pat 329, 368 ("Properly trained interviewers receive detailed written instructions on everything they are to say to respondents. . . . "); Larry C. Jones, Developing and Using Survey Evidence in Trademark Litigation, 19 Mem. St. U. L. Rev. 471, 477 (1989) ("[T]he survey-taker should provide detailed written instructions to the interviewers.").

Respectfully submitted

   /s/ Levi G. McCathern II
Levi G. McCathern, II
State Bar No. 00787990
lmccathern@mm-llp.com
Margaret R. Mead
State Bar No. 00792482
mmead@mm-llp.com

**McCathern Mooty, LLP**
3710 Rawlins, Suite 1600
Dallas, Texas 75219
Phone: 214-741-2662
Fax: 214-741-7417

and

Robert L. Raskopf
Jessica A. Rose
QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel.:  (212) 849-7000
Facs.:  (212) 849-7100

ATTORNEYS FOR PLAINTIFFS/COUNTER-
DEFENDANTS,
DALLAS COWBOYS FOOTBALL CLUB, LTD.
AND NFL PROPERTIES, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of May, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will forward notification of such filing to the following counsel of record for Defendant:

Austin H. England
Austin H. England, P.C.
909 Lake Carolyn Pkwy., Suite 150
Irving, Texas 75039

Daniel W. Schreimann
Schreimann & Associates, P.C.
909 Lake Carolyn Pkwy., Suite 150
Irving, Texas 75039

Peter J. Gleekel
Kyle J. Kaiser
Winthrop & Weinstine, P.A.
225 S. Sixth St., Suite 3500
Minneapolis, MN 55402

_____ /s/ Levi G. McCathern II _____
Levi G. McCathern, II / Margaret R. Mead