IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


| | | |
|---|---|---|
| DALLAS COWBOYS FOOTBALL | § | |
| CLUB, LTD. | § | Civil Action No. 06-cv-01906 |
| and | § | **ECF CASE** |
| NFL PROPERTIES, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| AMERICA'S TEAM PROPERTIES, INC., | § | |
| | § | |
| Defendant. | § | |


**BRIEF IN SUPPORT OF AMERICA'S TEAM PROPERTIES, INC.'S MOTION TO
EXCLUDE THE EXPERT REPORT AND TESTIMONY OF GABRIEL M. GELB**

# TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

LEGAL ARGUMENT ........................................................................................ 1

    **I.**    Legal Standard. ...................................................................................... 1

    **II.**    Mr. Gelb's Survey Does Not Survive Rule 403, Rule 702 And *Daubert*............... 3

        **A.**    Methodology Deficiencies: The Survey Tested An Improper Population And Failed to Simulate The Marketplace. ................................ 5

            **1.**    The Relevant Population Tested Was Under-Inclusive. ................. 5

            **2.**    The Survey Failed to Simulate the Marketplace. ............................ 9

        **B.**    The Survey Does Not Prove Secondary Meaning and Is Therefore Irrelevant. ...................................................................................... 11

        **C.**    The Survey Did Not Test for or Prove a Likelihood of Confusion. ......... 15

        **D.**    The Control Utilized in the Survey Was Inadequate. ............................... 17

        **E.**    Plaintiffs' Expert Report Was Not Complete. .......................................... 21

CONCLUSION ................................................................................................. 22

# TABLE OF AUTHORITIES

Page No.

*Am. Basketball Ass'n v. AMF Voit, Inc.*,
    358 F. Supp. 981 (S.D.N.Y.),
    *aff'd*, 487 F.2d 1393 (2d Cir. 1973) ................................................................5, 8

*Am. Home Prods. Corp. v. Barr Labs, Inc.*,
    656 F. Supp. 1058 (D.N.J. 1987),
    *aff'd*, 834 F.2d 368 (3rd Cir. 1987) ....................................................................8

*Amstar Corp. v. Domino's Pizza, Inc.*,
    615 F.2d 252, 264 (5th Cir. 1980) ..................................................5, 8, 17, 22

*Bank of Tex. v. Commerce Sw, Inc.*,
    741 F.2d 785 (5th Cir. 1984) ......................................................................13, 14

*Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*,
    533 F. Supp. 75 (S.D. Fla. 1981),
    *aff'd* 716 F.2d 854 (11th Cir. 1983) ....................................................................7

*Citizen Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*,
    2003 WL 24010950 (W.D. Pa. Apr. 23, 2003) ....................................................5

*Cumberland Packing Corp. v. Monsanto Co.*,
    32 F. Supp. 2d 561 (E.D.N.Y. 1999) ................................................................18

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).................................................................1, 2, 3, 4, 5, 22

*Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*,
    188 F.3d 501 (4th Cir. 1999) ..............................................................................4

*Ecce Panis, Inc. v. Maple Leaf Foods USA, Inc.*,
    2007 LEXIS 85780 (D. Ariz. Nov. 7, 2007).....................................................20

*Exxon Corp. v. Tex. Motor Exch., Inc.*,
    628 F.2d 500 (5th Cir. 1980) ......................................................................16, 17

*Gillette Co. v. Norelco Consumer Prods. Co.*,
    69 F. Supp. 2d 246 (D. Mass. 1999) ...................................................................8

*Holiday Inns, Inc. v. Holiday Out in Am.*,
    481 F.2d 445 (5th Cir. 1973) ............................................................................17

*I.P. Lund Trading ApS v. Kohler Co.*,
 118 F. Supp. 2d 92 (D. Mass. 2000) ..................................................11

*Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd., P'ship.*,
 34 F.3d 410 (7th Cir. 1994) ..................................................19, 20

*K'Arsan Corp. v. Christian Dior Perfumes, Inc.*,
 166 F.3d 1214 (6th Cir. 1998) ..................................................4

*Kellogg Co. v. Nat'l Biscuit Co.*,
 305 U.S. 111 (1938)..................................................11

*Kumho Tire Co., Ltd. v. Carmichael*,
 526 U.S. 137 (1999)..................................................2

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*,
 452 F. Supp. 2d 772 (W.D. Mich. 2006) ..................................................9

*Lindy Pen Co. v. Bic Pen Corp.*,
 725 F.2d 1240 (9th Cir. 1984) ..................................................10

*Lois Sportswear, U.S.A. v. Levi Strauss*,
 799 F2d 867 (2d Cir. 1986)..................................................3

*Major League Baseball Props., Inc. v. Sed Non Olet Denarius, Ltd.*,
 817 F. Supp. 1103 (S.D.N.Y. 1993), ..................................................18

*Malletier v. Dooney & Burke, Inc.*,
 525 F. Supp. 2d 558 (S.D.N.Y. 2007)..................................................3

*McGraw-Hill, Inc. v. Comstock Partners, Inc.*,
 743 F. Supp. 1029 (S.D.N.Y. 1990)..................................................8

*Nat'l Football League Props. Inc. v. ProStyle, Inc.*,
 57 F. Supp. 2d 665 (E.D. Wis. 1999)..................................................4, 18

*Nat'l Football League Props., LLC v. N.J. Giants*,
 637 F. Supp. 507 (D.N.J. 1986) ..................................................4

*Palmetto Ford, Inc. v. Am. Appliance & TV Inc.*,
 CA No. 2:99-667-23 (D.S.C. July 28, 1999) ..................................................9, 10

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
 354 F.3d 1020 (9th Cir. 2004) ..................................................16

*Riviana Foods, Inc. v. Societe Des Produits Nestle, S.A.*,
   33 U.S.P.Q. 2d 1669 (S.D. Tex. 1994) ...........................................................16

*Sawyer v. S.W. Airlines Co.*,
   243 F. Supp. 2d 1257 (D. Kan. 2003) .............................................................2

*Shuffle Master, Inc. v. Awada*,
   83 U.S.P.Q.2d 1054 (D. Nev. 2006) ..............................................................14

*Simon Prop. Group v. mySimon, Inc.*,
   104 F. Supp. 2d 1033 (D. Ind. 2000) .........................................................3, 10

*Spraying Sys. Co. v. Delavan, Inc.*,
   975 F.2d 387 (7th Cir. 1992) ...........................................................................4

*Spraying Sys. Co. v. Delavan, Inc.*,
   762 F. Supp. 772 (E.D. Ill. Mar. 22, 1991) ...................................................14

*Standard Oil Co. v. Standard Oil Co.*,
   252 F.2d 65 (10th Cir. 1958) ...........................................................................3

*Starter Corp. v. Converse, Inc.*,
   170 F.3d 286 (2d Cir. 1999) .............................................................................4

*Vision Ctr. v. Opticks, Inc.*,
   596 F.2d 111 (5th Cir. 1979) .........................................................................14

*Vision Sports, Inc. v. Melville Corp.*,
   888 F.2d 609 (9th Cir. 1989) ...........................................................................8

*Volkswagenwerk Atk v. Rickard*,
   492 F.2d 474 (5th Cir. 1974) .........................................................................11

*Weight Watchers Int'l, Inc. v. Stouffer Corp.*,
   74 F. Supp. 1259 (S.D.N.Y. 1990) ...................................................................4

*Wells Fargo & Co. v. WhenU.com, Inc.*,
   293 F. Supp. 2d 734 (E.D. Mich. 2003) .........................................................10

*Winning Ways, Inc. v. Holloway Sportswear, Inc.*,
   913 F. Supp. 1454 (D. Kan. 1996) ............................................................3, 4, 8

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*,
   698 F.2d 786 (5th Cir. 1983) .........................................................................11

*Zippo Mfg. Co. v. Rogers Imports, Inc.*,
    216 F. Supp. 670 (S.D.N.Y. 1963) ..................................................................14

**Rules:**

Fed. R. Evid. 403 .............................................................................................

Fed. R. Evid. 702 .............................................................................................

**Other:**

J. THOMAS MCCARTHY,
    MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (4th ed. 2003 & Supp. 2008).......

Diamond, Dr. Shari Seidman
    *Reference Manual on Scientific Evidence*(1994)....................................................

Rivera, Artemio
    *Testing the Admissibility of Trademark Surveys After Daubert*,
    84 J. Pat. & Trademark Off. Soc'y 661 (2002).......................................................

Upadhye, Shashank,
    *Trademark Surveys:  Identifying the Relevant Universe of Confused Consumers*,
    8 Fordham Intell. Prop. Media & Ent. L.J. 549 (1998)...........................................

Defendant America's Team Properties, Inc. ("America's Team") respectfully submits the following Brief in support of its Motion to Exclude the Expert Report and Testimony of Gabriel M. Gelb.

## INTRODUCTION

Plaintiffs Dallas Cowboys Football Club, Ltd. ("Dallas Cowboys") and NFL Properties, Inc. ("NFL Properties," collectively, "Plaintiffs") have designated the report and testimony of Gabriel M. Gelb for the purposes of proving elements of Plaintiffs' trademark infringement, dilution and unfair competition claims against Defendant America's Team Properties, Inc. ("America's Team.")   Among other things, Plaintiffs' expert conducted an internet survey, purportedly to determine "secondary meaning" of the mark AMERICA'S TEAM and likelihood of confusion between a purported use of AMERICA'S TEAM by Plaintiffs and by Defendant.[1] However, fatal flaws exist in the methodology of the execution of the survey, methods of calculating the results, and in the disclosures in the subsequent report which make the results inherently unreliable, not relevant, confusing and a waste of the jury's time.   Accordingly, this Court should exclude the survey and report of Mr. Gelb, as it  fails to satisfy the requirements under the Federal Rules of Evidence and the Supreme Court's *Daubert* decision.

## LEGAL ARGUMENT

**I.      Legal Standard.**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine as fact
> in issue, a witness qualified as an expert by knowledge, skill,

---

[1] Due to the volume and repetition of the documents supporting this motion and Defendant's Motion for Summary Judgment, filed concurrently, Defendant has included all documentation supporting this motion in Defendant's Appendix in Support of its Motion for Summary Judgment, filed under seal, and hereby incorporates by reference that appendix herein.  In particular, Mr. Gelb's report exists in the Appendix at ATAPP000179-229, Mr. Gelb's Preliminary Data exists at ATAPP000230-242, and the transcript of Mr. Gelb's deposition exists at ATAPP000243-282.)

> expertise, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Under this rule, the Court examines whether the expert is initially qualified to give the opinion proposed and whether the opinion expressed meets the requirements set forth in *Daubert*—whether it "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (finding Fed. R. Evid. 702 did not establish a "general acceptance" test as previously applied, but rather required courts to test expert testimony for both relevancy and reliability prior to admitting such evidence, creating thresholds). This "gatekeeping" function of the court extends not only to scientific testimony, but also to technical and other specialized testimony. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). Under the *Daubert* test, the existence of flaws in a survey could affect its reliability and/or relevance to the point of making the survey inadmissible.

In determining reliability, the Court is to apply the flexible *Daubert* test, which includes the following factors: "(1) whether the proffered technique can and has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a technique in the relevant community." *Sawyer v. S.W. Airlines Co.*, 243 F. Supp. 2d 1257, 1266 (D. Kan. 2003) (citing *Kumho Tire Co., Ltd.*, 526 U.S. at 149). To determine relevancy, the court should also consider whether the expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Testimony is to be admitted only if it is "[so] sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quotation omitted).

In addition to Rule 702 and *Daubert*, the Court is to consider the admissibility of the survey under Federal Rule of Evidence 403—whether the probative value of the survey outweighs its prejudicial effects, is a waste of time, or is confusing to the factfinder. Fed. R. Evid. 403; *see also Simon Prop. Group v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1038 (D. Ind. 2000) ("The Court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility. If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial."). A survey should thus be excluded under Rule 403 when the flaws in its methodology that the survey proves little and the jury is likely to be misled. *Malletier v. Dooney & Burke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007).

## II.    Mr. Gelb's Survey Does Not Survive Rule 403, Rule 702 And *Daubert.*

Plaintiffs cannot satisfy their burden of proving that Mr. Gelb's expert report is admissible or reliable. There are significant defects with Mr. Gelb's survey and report that require a finding of inadmissibility and unreliability under Federal Rules of Evidence 403, 702, and *Daubert,* including a flawed and biased methodology, failure to use a proper control, failure to prove secondary meaning, misleading statistics, and the failure to provide pertinent information in the report.

In general, public recognition surveys may be used to establish a likelihood of confusion. *See Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 72 (10th Cir. 1958). Technical and methodological deficiencies in a survey usually go to the weight to be given the survey, not to its admissibility. *Id.; see also Lois Sportswear, U.S.A. v. Levi Strauss*, 799 F2d 867, 875 (2d Cir. 1986). However, when the deficiencies are substantial so as to render the survey's conclusion untrustworthy, a court should exclude the survey from evidence. *See, e.g., Winning Ways, Inc. v.*

*Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1466 (D. Kan. 1996) (holding flawed survey inadmissible); *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992) (holding consumer survey of secondary meaning held to be too flawed to create a genuine issue of material fact at summary judgment stage). Indeed, the federal courts, based upon Rules 702, 403 and the *Daubert* factors, have not been reluctant to issue rulings rejecting surveys due to lack of relevance and/or reliability. *See, e.g., Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*, 188 F.3d 501, 505 (4th Cir. 1999); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999); *K'Arsan Corp. v. Christian Dior Perfumes, Inc.*, 166 F.3d 1214 (6th Cir. 1998); *Nat'l Football League Props., Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 668-69 (E.D. Wis. 1999).

*Daubert* emphasizes the trial court's responsibility in ensuring that survey evidence is both reliable and relevant prior to admission of the survey. *Winning Ways, Inc.*, 913 F. Supp. at 1466. The "proponent of a consumer survey has the burden of establishing that it was conducted in accordance with accepted principles of survey research" and that the *Daubert* requirements are satisfied. *See Nat'l Football League Props. v. N.J. Giants,* 637 F. Supp. 507, 513 (D.N.J. 1986). The criteria for determining the reliability and trustworthiness of a consumer survey include: (1) a properly defined universe; (2) a representative sample of that universe must participate; (3) the questions must be clear, precise and non-leading; (4) the survey must be double-blind, with sound interview procedures followed; (5) the data must be reported accurately; (6) the data must be analyzed in accordance with accepted statistical principles; and (7) the whole survey process must be conducted objectively. *See* Upadhye, Shashank, *Trademark Surveys: Identifying the Relevant Universe of Confused Consumers*, 8 Fordham Intell. Prop. Media & Ent. L.J. 549 (1998) (citing *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 19 U.S.P.Q. 2d 1321, 1330-

1331 (S.D.N.Y. 1990)); *see also Citizen Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 2003 WL 24010950, at *1 (W.D. Pa. Apr. 23, 2003) (citing 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:159 (4th ed. 2003)). The Fifth Circuit has also approved use of the above-listed factors in considering the relevancy of survey evidence offered to show trademark infringement. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980). Mr. Gelb's survey and report do not meet the above-listed criteria. The survey and report contain an improper and underinclusive survey universe, an improper marketplace, an inadequate control, a failure to prove secondary meaning, and an untrustworthy report. As such, the survey should be excluded.

**A.     *Methodology Deficiencies: The Survey Tested An Improper Population And Failed to Simulate The Marketplace.***

**1.     The Relevant Population Tested Was Under-Inclusive.**

Mr. Gelb's survey focused on an under-inclusive and therefore irrelevant population. For a survey to be relevant, the proper population must be selected. *See* Artemio Rivera, *Testing the Admissibility of Trademark Surveys After Daubert*, 84 J. Pat. & Trademark Off. Soc'y 661 (2002). It is well settled that one of the most important factors in assessing the validity of an opinion poll is the adequacy of the "survey universe," that is the persons interviewed must adequately represent the opinions which are relevant to the litigation. *Amstar Corp. v. Domino's Pizza, Inc.*, 65 F.2d 252, 264 (5th Cir. 1980); *Am. Basketball Ass'n v. AMF Voit, Inc.*, 358 F. Supp. 981, 986 (S.D.N.Y.), *aff'd*, 487 F.2d 1393 (2d Cir. 1973). "The appropriate universe should include a fair sampling of those purchasers most likely to partake of the *alleged infringer's goods and services*." *Amstar Corp.*, 65 F.2d at 264 (emphasis added) (internal citations omitted) (noting that plaintiff's survey included only female heads of households which represented the consumers of plaintiff's goods, not defendant's) ; *see also* 6 MCCARTHY, *supra*,

§ 32:159 (4th ed. 2008) ("The proper universe to survey is the potential buyers of the *junior user's* goods or services.") (emphasis in original.) Thus, the proper universe to survey in this case was Defendant's potential consumers.

Defendant's consumers primarily include individuals interested in high school and college sports, as clearly emphasized on its website which provides information on athletic team sponsorship and "America's Team" awards for excellence in sports in various categories promoting "Outstanding Athletes, Upstanding Citizens." (Def.'s App. ATAPP000081 at 213:9-22.) However, Plaintiffs' survey was directed primarily at males over the age of 18 who followed the NFL—the group that makes up *Plaintiffs'* primary consumers. By focusing on this population, the survey excludes a large portion of the relevant population of individuals interested in athletics.

While on its face Plaintiffs' survey purports to have screened participants by interest in high school, college or professional sports during the initial screening questions, (*see* Def.'s App. ATAPP000201) Plaintiffs' expert employed a selection a quota of 70% men and 30% women that was not disclosed in Mr. Gelb's report. (Def.'s App. ATAPP000262 at 78::18-79:9.) The survey therefore incorporated an irrelevant gender stratification which skewed the results to focus on a population that was largely made up of adult men, the group most likely to contain fans of the National Football League ("NFL"). This quota, specifically incorporated by Mr. Gelb, was based entirely on a Harris Poll that found 63% of those who followed the NFL were male. (Def.'s App. ATAPP000262-63 at 78:18-79:9, 79:23-80:19, 81:2-25.) In fact, rather than rounding the quota down to 60% males, Mr. Gelb chose to round it up to 70%. (*Id.*) This high male quota unfairly biased the findings by concentrating on adult male consumers who watched the NFL—consumers of Plaintiffs' services, but *not* necessarily the Defendant's. When asked why he did not want more women taking the poll, Mr. Gelb's response was "because I already knew—we had the information that 63% of those who follow the NFL are men"—admitting the sole foundation for the quota split. (Def.'s App. ATAPP000262 at 4-12.) Mr. Gelb did not seek to find out whether there was information as to the gender split between

fans of college or high school sports, the more relevant population. (Def.'s App. ATAPP000263 at 81:9-22.) By failing to include a fair and appropriate gender split or focus upon individuals generally interested in athletics, the relevant universe, Mr. Gelb's survey was materially and unfairly under-inclusive.

Further, if a survey is under-inclusive, its value depends on the extent to which the excluded population is likely to react differently from the included population. Dr. Shari Seidman Diamond, *Reference Manual on Scientific Evidence*, at 241 (1994). Here, women were apparently excluded to a statistically significant degree because they were likely to react differently than men. As such, the survey universe, consisting mainly of individuals most likely to follow the NFL, overrepresented the strength of the claimed trademark. *See Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 533 F. Supp. 75, 80 (S.D. Fla. 1981), *aff'd* 716 F.2d 854 (11th Cir. 1983). In *Brooks Shoe Manufacturing. Co.*, the survey testing likelihood of confusion for athletic shoe trade dress included a survey universe of spectators and participants at a running event. The court found this sampling under-inclusive and inadequate for failing to include general sporting goods consumers, but rather focusing on a sophisticated subset of those likely to purchase running shoes who were likely most knowledgeable about the trade dress. The survey evidence was discounted by the court on the basis that it likely substantially overrepresented the strength of the trademark. *Id.* at 80 ("since the survey failed to examine the proper universe, the 71% recognition rate among those interviewed must be discounted"). Plaintiffs' expert survey presents a highly similar situation in that it failed to include a highly relevant portion of consumers, namely female consumers, but focused instead on what can only be considered a "sophisticated subset" individuals—adult men who statistically were most likely to follow the NFL. This gender stratification skewed the results by substantially over-representing the strength of Plaintiffs' trademark.

As noted, courts, including the Fifth Circuit, have not hesitated to exclude surveys in similar cases where the survey failed to ensure the universe was limited to those who were potential consumers of the defendant's product or services. *See, e.g., Amstar*, 615 F.2d at 264 (the survey neglected defendants' primary consumers and the court held "we do not believe the proper universe was examined, and the results of the survey must therefore be discounted"); *see Am. Basketball Ass'n*, 358 F. Supp. 981. In *American Basketball* which concerned the red, blue and white color of basketballs, the plaintiff surveyed males between the ages of twelve and twenty-three who played basketball within the last year. *Id.* at 986. The court criticized the universe as being too narrow because it did not include all people in the market to buy basketballs and thus rejected the survey all together. *Id.; see also Gillette Co. v. Norelco Consumer Prods. Co.*, 69 F. Supp. 2d 246, 262-263 (D. Mass. 1999) (finding the survey unreliable for failing to include women as prospective purchasers of shaving razors); *Am. Home Prods. Corp. v. Barr Labs, Inc.*, 656 F. Supp. 1058 (D.N.J. 1987) (noting the universe of Advil-tablet users was too narrow), *aff'd*, 834 F.2d 368 (3rd Cir. 1987); *McGraw-Hill, Inc. v. Comstock Partners, Inc.*, 743 F. Supp. 1029 (S.D.N.Y. 1990) (criticizing the sample universe of investors or registered representatives that failed to include people who would actually avail themselves to the defendant's products); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) (criticizing the survey universe because it had too narrow age restrictions); *Winning Ways, Inc.* 913 F. Supp. at 1466 (D. Kan. 1996) (survey inadmissible for failure to select proper universe). In fact, contrary to Mr. Gelb's implications,[2] courts have criticized Mr. Gelb's surveys in the past for an improper and under-inclusive survey universe.[3] Based on the forgoing,

---

[2] During his deposition, Mr. Gelb was asked if he had ever had an expert report stricken by a court, or even a portion of a report, to which he answered "No." (Def.'s App. ATAPP00280 at 6-13.) *Contra infra* nn.3, 4, 11.

[3] *See Riviana Foods, Inc. v. Societe Des Produits Nestle, S.A.,* 33 U.S.P.Q. 2d 1669, 1671 (S.D. Tex. 1994) (finding the Gelb survey to have little, if any, probative value because the universe was not limited to purchasers of the

Mr. Gelb's survey in this case must be excluded as irrelevant for its failure to represent the proper survey universe.

**2.    The Survey Failed to Simulate the Marketplace.**

Another fatal flaw with Mr. Gelb's survey is that it does not simulate actual market conditions in which consumers would view and potentially purchase Defendant's goods and services.  A survey to test the likelihood of confusion must attempt to replicate the thought process of consumers encountering the disputed mark as they would in the marketplace.  *See* 6 McCARTHY, *supra* § 32:163 ("the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results.")  As noted by McCarthy, deficiencies in survey questions have led courts to give a survey little weight as evidence, including showing interviewees photographs which are not true representations of the product as actually sold and giving respondents less information than they would actually receive in real purchasing situations.  *Id.* at 32:328-329; *see also Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 781 (W.D. Mich. 2006).

*Leelanau Wine Cellars, Ltd*, involved a survey to test for confusion between marks used by two different wine makers.  The survey was completed in a mall and included Michigan consumers over 21 years of age who had purchased or expected to purchase a bottle of wine within three months.  The respondents were shown five bottles of wine simultaneously.  The defendant's wine was predominantly sold in tasting rooms and on its internet website and was not typically sold directly next to other brands, nor was it sold in a setting similar to the one used in the survey—the mall.  As such, the court found that the "survey was conducted in a manner that was substantially at odds with the circumstances under which most consumers encounter

---

product at issue, in addition to other deficiencies); *Palmetto Ford, Inc. v. Am. Appliance & TV Inc.*, CA No. 2:99-667-23 (D.S.C. July 28, 1999) (finding Gelb's survey to have little probative value because the survey failed to

Defendant's wine." *Id.* at 784. This failure to replicate the marketplace rendered the survey of little or no probative value. *Id.; see also Simon Prop. Group, L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1038 (D. Ind. 2000) (rejecting a survey for failure to replicate market conditions by displaying the home pages of the two marks one right after the other); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 766 (E.D. Mich. 2003) ("a survey to test likelihood of confusion must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace"); *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245-1246 (9th Cir. 1984) (in a trademark infringement dispute over identical marks, a telephone survey obtained by the plaintiff was criticized for a failure to replicate market conditions).

By displaying a single image of a black hat with white letters, Mr. Gelb's survey suffers the same fatal flaw—a failure to accurately simulate Defendant's relevant marketplace.[4] Defendant's products and services are sold nearly exclusively on its website, which discusses and promotes those goods and services, including the promotion of academic and athletic excellence. (Def.'s App. ATAPP000606-643; *see also* http://www.americasteamusa.com). Thus, consumers of Defendant's goods, such as a hat, do not see the hat in a vacuum, but only in the context of Defendant's website. By merely placing a black hat, with white lettering, alone on a computer screen, Mr. Gelb has materially failed to "replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace." *Lindy Pen Co.*, 725 F.2d at 1245-46.

---

determine if respondents actually shopped in the relevant areas).
[4] Mr. Gelb has been criticized by a court in the past for the failure to simulate the market conditions. In *Palmetto Ford, Inc. v. America Appliance & TV Inc.*, CA No. 2:99-667-23 (D.S.C. July 28, 1999), the court found Gelb's survey to have little probative value because the survey failed to determine if respondents actually shopped in the relevant areas.

### B.    *The Survey Does Not Prove Secondary Meaning and Is Therefore Irrelevant.*

Mr. Gelb opined that there was a 25% response rate to prove the Dallas Cowboys have acquired secondary meaning in "America's Team."  Not only are these results too low to prove secondary meaning, but Mr. Gelb highly exaggerates the finding of secondary meaning by including numerous responses that should not have been included.

Secondary meaning occurs when, in the minds of the public, the primary significance of a mark is to identify a particular source of a product or service.  *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 118 (1938); *Volkswagenwerk Atk v. Rickard*, 492 F.2d 474, 477 (5th Cir. 1974).  It is not necessary that the consumer knows the actual source, but that the goods or services come from a single, consistent source.  *See, e.g., I.P. Lund Trading ApS v. Kohler Co.,* 118 F. Supp. 2d 92, 107 (D. Mass. 2000); *Zatarains, Inc. v. Oak Grove Smokehouse,* Inc. 698 F.2d 786, 795 (5th Cir. 1983), (noting that, in assessing a claim of secondary meaning, the mark must denote to the consumer "a single thing coming from a single source").  Mr. Gelb's survey report concluded that 25% of the respondents cited "America's Team" as being uniquely associated with the Dallas Cowboys professional football team.  (*See* Def's App. ATAPP000188.)  Question one was identified as the secondary meaning question: "What, if anything, comes to mind when you see the words America's Team."[5]  (*See* Def.'s App. ATAPP 000255-56 at 52:7-53:3 (discussing the decision to go straight to the issue of secondary meaning); *see also* Def.'s App. ATAPP 000206).  Further examination of the responses shows that included in this 25% were respondents who, after naming the Dallas Cowboys in response to Question one, later named another team, teams or entity that they believed was also associated with the phrase "America's

---

[5] America's Team disputes that this question is actually the appropriate secondary meaning question, as discussed in Mr. Berger's expert report.  However, it assumes for the sake of this argument only, that the question is Defendants' starting point for secondary meaning.

Team." (Def.'s App. ATAPP000283-383)[6] (printout of responses). Some examples of responses that included the identification of other entities include:

- Respondent no. 234: "New England Patriots" (Q8) (ATAPP000288);

- Respondent no. 550: "Adidas" (Q8) (ATAPP300);

- Respondent no. 848: "Home Shopping Network" (Q2) (ATAPP000309);

- Respondent no. 1163: "one or more TV networks" (Q8) (ATAPP000325);

- Respondent no. 1310: "Reebok" (Q8); "NCAA" (Q11) (ATAPP000322);

- Respondent no. 1328: "the braves and the cowboys" (Q2) (ATAPP000333);

- Respondent no. 1437: "baseball" (Q8) (ATAPP000337);

- Respondent no. 1710: "Reebok" (Q2) (ATAPP000350);

- Respondent no. 1775: "other college sports" (Q8) (ATAPP000352);

- Respondent no. 1818: "any other sports teams" (Q8) (ATAPP000353);

- Respondent no. 4803: "New England Patriots) (Q3) (ATAPP000357);

- Respondent no. 5610: "Denver Broncos" (Q5) (ATAPP000370);

- Respondent no. 2674 ("NY Yankees" (Q5); "baseball team most wins" (Q8); "NFL, MBA" (Q9); "tied to sports leagues" (Q11) (ATAPP000456);

- Respondent no. 4047 "Dallas Desperados" (Q8) (ATAPP000458);

- Respondent no. 4223 "they use this for whichever team is on top") (Q6) (ATAPP000458);

Regardless of whether or not a respondent identified the Dallas Cowboys, the identification of an additional team or entity within the survey fails to prove secondary meaning—that the goods at

_____

[6] Within the exhibit the responses with a yellow mark on Question 1 indicate those that were counted toward Mr. Gelb's finding of secondary meaning and those with a blue mark in connection with Question 2 and/or

issue came from a single consistent source—and those responses should have been excluded from Mr. Gelb's analysis as to secondary meaning. In Mr. Gelb's own words, the definition of secondary meaning is "where an individual ascribes the source of the material to on specific entity." (Def.'s App. APP000274 at 125:7-10.) By removing the responses clearly identifying more than one source, the percentage rate is reduced by up to six percentage points, excluding the 4% error factor.[7]

Furthermore, Mr. Gelb's survey included responses to Question one that stated the Plaintiff "used to" be known as "America's Team" and that merely mentioned "football" or the NFL rather than directly naming the Dallas Cowboys. For example, in response to Question one, the following responses were given:

- Respondent no. 1024: "use[d] to be the Cowboys." (ATAPP000317)

- Respondent no. 4825:   "they used to say it was the Dallas Cowboys." (ATAPP000358)

- Respondent no. 987: "NFL." (ATAPP00316)

- Respondent no. 1437: "football." (ATAPP000337)

As indicated in his deposition, Mr. Gelb counted each of these responses as proof of secondary meaning, regardless of whether a respondent actually identified a team or organization in addition to the Dallas Cowboys. (Def.'s App. APP000276 at 133:3-136:7.)

Even if the percentage of secondary meaning reported by Mr. Gelb was calculated correctly, 25% is insufficient to establish secondary meaning in the minds of the consumers. The burden of proof of secondary meaning is not an easy one to satisfy, for a "high degree of proof is

---

additional responses indicate those that were counted toward Mr. Gelb's finding of likelihood of confusion. (Def.'s App. ATAPP000269-70 at 108:20-110:13.)

necessary to establish secondary meaning of a descriptive term." *Bank of Tex. v. Commerce Sw, Inc.*, 741 F.2d 785, 787 (5th Cir. 1984) (burden to prove secondary meaning is "substantial"); *see also Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 118 (5th Cir. 1979) (internal citations omitted) (criticizing survey but suggesting that 80% consumer association was sufficient to show secondary meaning). Numerous courts have found percentages higher than 25 to be insufficient to establish secondary meaning. *See, e.g., Spraying Sys. Co. v. Delavan, Inc.*, 762 F. Supp. 772 (E.D. Ill. Mar. 22, 1991), *aff'd*, 975 F.2d 387 (7th Cir. Sept. 17, 1992). In *Spraying Systems*, the plaintiff produced a survey that produced a 38% response rate. The judge noted:

> though a 38% response rate may be probative for purposes of likelihood of confusion, in order to prove secondary meaning a 'substantial' portion of buyers must associate the product with one source and generally over 50% is regarded as clearly sufficient, while a 38% figure would have been marginal even in a properly designed survey.

*Id.*; *see also Shuffle Master, Inc. v. Awada*, 83 U.S.P.Q.2d 1054, 1059 (D. Nev. 2006) (noting approximately 30% or more is probative of secondary meaning); *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670 (S.D.N.Y. 1963) (indicating that survey evidence showing that 25% of the interviewees connected plaintiff's mark with a single source was insufficient proof of secondary meaning). Professor McCarthy also discusses percentages necessary to prove secondary meaning, noting that it has been held that survey evidence showing 25% of the interviewees connected plaintiff's mark with a single source was insufficient to prove secondary meaning. 2 McCarthy, *supra*, § 15:45.

In Plaintiffs' expert survey, more than 75% of the respondents did not identify Plaintiff Dallas Cowboys as being associated with "America's Team." As importantly, according to the

---

[7] The Supplemental Report of James T. Berger, (Def.'s App. APP000545) concludes the actual results for secondary meaning must exclude 35 responses that would shrink the total by six percentage points and, with a standard 4% error factor, the results could perhaps be even lower.

Gelb survey, approximately that same percentage identified a team or entity other than the Dallas Cowboys as the single source. (*See* Def.'s App. ATAPP000545 (noting that 23% identified some other team or entity)). Thus, neither Plaintiff Dallas Cowboys nor can any other team or entity an be considered "America's Team" based upon the survey evidence.

### C.    *The Survey Did Not Test for or Prove a Likelihood of Confusion.*

Not only did the Gelb survey fail to prove secondary meaning, but it was irrelevant to the determination of a likelihood of confusion. Relevancy of the survey questions will mainly depend on whether the questions address the issues or the facts relevant to the case. *See* Rivera, *supra* at 685 (internal citations omitted); Diamond, *supra*, at 236-237 (must be designed to collect information relevant to the legal controversy). A fundamental shortcoming of Mr. Gelb's survey is that it failed to prove or disprove likelihood of confusion and is therefore irrelevant. Rather, the survey strictly attempted to determine if "America's Team" is so closely associated with the Dallas Cowboys football team as to have achieved secondary meaning. The internet survey showed the respondent a single image of a hat embroidered with the words "America's Team" (or the control—"The Best") and asked a series of questions to determine who the respondent believed produced the hat or what organization came to mind when shown the hat. This is a test for secondary meaning, not likelihood of confusion. (*See* Def.'s App. ATAPP000507-10.) Mr. Gelb's survey, showing only the image of a copy of Defendant's product on the computer screen, did not simulate the shopping experience, nor did it allow the respondent to "confuse" the source of the hat with any other goods.

Mr. Gelb's survey results also fail to prove a likelihood of confusion. Mr. Gelb contends that Question number two in his survey relates to likelihood of confusion: "Which organization puts out this hat or don't you know?" Based upon answers to this question, in addition to answers from later questions, Mr. Gelb opined that there was a confusion rate of 19%. (Def.'s

App. ATAPP000273 at 122:23-124:13.).   However, Mr. Gelb included in those responses to Question number one were responses in which the respondent named more than one possible source.  For example, Respondent no. 546 listed "either Nike or Cowboys" and Respondent no. 1947 : "The Dallas Cowboys or Chevrolet/GM." (Def.'s App. ATAPP000456.)  Also included were responses to questions that identified completely different organizations but made later mention of the NFL.  For example:  Respondent no. 848: "Home Shopping Network" (Q2) (Def.'s App. ATAPP000309); Respondent no. 4783:  "Football Team" (Q2) (Def.'s App. ATAPP000356); Respondent no. 1548 named the Atlanta Braves in response to question 1, but later noted the Dallas Cowboys in response to question 14, stating "they were first known as america's team."   (Def.'s App. ATAPP000343.)   All of these responses were incorrectly included by Mr. Gelb as proof of likelihood of confusion.

Given the numerous flaws with Mr. Gelb's survey, a response rate of 19% is too low to be probative on the issue of likelihood of confusion.  *See, e.g., Riviana Foods, Inc. v. Societe Des Produits Nestle, S.A.*, 33 U.S.P.Q. 2d 169 (S.D. Tex. 1994) (finding a survey flawed for numerous reasons including inappropriate survey universe and leading questions and noting that the failure of approximately 75% of the respondents to connect the two products in an confusion study was strong evidence that there was no confusion); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020 (9th Cir. 2004) (court found 22% confusion was not sufficient when the survey's accuracy had been validly criticized).

Of additional concern, Plaintiffs' survey was a "word association" test.  Questions that merely attempt to associate a word or phrase to a product are not probative of likelihood of confusion or trademark infringement.  *See Rivera, supra* at 686 (citing *Exxon Corp. v. Tex. Motor Exch., Inc.*, 628 F.2d 500 (5th Cir. 1980)).  In the Gelb survey, respondents were

presented with the "America's Team" hat and asked, as the first question: "what, if anything, comes to mind when you see the words America's Team?"  (*See* Def.'s App. ATAPP000185.). The format of this question, confronting a participant with a mark and more or less asking if it brought anything else to mind, is a "word association" test.  As noted above, the Fifth Circuit has held that such a procedure degenerates "into a mere word-association test entitled to little weight." *Amstar Corp.* 615 F.2d at 264, (citing *Holiday Inns, Inc. v. Holiday Out in Am.*, 481 F.2d 445, 448 (5th Cir. 1973); *see also Exxon Corp.*, 628 F.2d at 500.

Based on the forgoing, the Gelb survey failed to properly address the issue of likelihood of confusion and overestimated the results, further support to exclude the survey.

### D.    *The Control Utilized in the Survey Was Inadequate.*

Trademark infringement surveys are designed to show how a trademark influences respondents' perceptions or understanding of a product.  *See* Diamond, *supra* at 256.  Thus, the question being tested is whether an allegedly infringing trademark misleads the consumer to believe it comes from, or is affiliated with, a different source (Plaintiffs' goods or services). However, with any survey, there are also the issues of whether consumers have preexisting beliefs that may be reflected in a survey response and "background noise" (e.g., respondents who misunderstand the question or misstate their response) that need to be taken into consideration. *Id.*  A control is designed to address both background noise and any potential causal inferences about the effect of a trademark being evaluated, such as preexisting beliefs rather than actual impressions produced by the presentation of the trademark.  *Id.* at 256-257.  Only by adding an appropriate control group, can a survey expert directly test the influence of the stimulus by removing preexisting beliefs or other background noise.  *Id.*

In the most basic and common form, respondents are randomly assigned to one of two conditions—the actual survey condition viewing the allegedly infringing trademark or the

control condition—answering the same set of questions. *Id.* The surveyor then compares the responses of each group to evaluate the allegedly infringing trademark group. *Id.* By removing the control group responses, the differences between the positive responses from the true experimental group and the control group can therefore be attributed directly to the allegedly infringing trademark. *Id.* Without the control group, it is impossible to determine how much of the positive response is due to respondents' preexisting beliefs or other background noise. *Id.*; *see also* Rivera, *supra* at 686 (noting that surveys designed to prove trademark infringement without a control, or with an inadequate control, may not be able to properly report whether the source of confusion comes from a mental association between two marks or if it is just the result of guessing, natural confusion, and/or a badly conducted survey). Numerous courts have criticized or excluded surveys for a failure to utilize an appropriate control. *See, e.g., Nat'l Football League Props., Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665 (E.D. Wis. 1999) (court excluded survey evidence for failure to include the use of a control in an expert report); *Major League Baseball Props., Inc. v. Sed Non Olet Denarius, Ltd.*, 817 F. Supp. 1103, 1123-24 (S.D.N.Y. 1993) (holding that "both surveys contain a complete lack of controls rendering the data meaningless and having no evidentiary value"), *vacated pursuant to settlement*; *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 574-575 (E.D.N.Y. 1999) (rejecting survey as unreliable, in part because control failed).

An appropriate control should be one that "shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influences is being assessed." Diamond, *supra* at 258; *see also Cumberland*, 32 F. Supp. 2d at 575 (criticizing survey in NATRA-TASE versus NUTRASWEET trademark dispute because "not one of the controls has a name sounding remotely like Natra-Taste"). Further, "a control

stimulus should not be less attractive than the experimental stimulus if the survey is designed to measure how familiar the experimental stimulus is to respondents, since attractiveness may affect perceived familiarity."[8] *Id.*

In Mr. Gelb's survey, roughly half of the participants were shown a black hat with the embroidered phrase "The Best" rather than "America's Team" as a control to test the general background noise. The phrase "The Best" is clearly less attractive and shares none of the characteristics of the trademark at issue. When questioned about the use of a more similar control, such as "Nation's Team," Mr. Gelb found the control to be too similar to the trademark at issue because it contained one of the terms.[9] Mr. Gelb's response was at best disingenuous. There is no claim in this case that Plaintiffs have any rights in the separate terms "America's" or the highly descriptive term "Team." Use of "team" in the control does not create a similar characteristic to the one being tested. Furthermore, courts have accepted controls incorporating one word from the trademark at issue in the past without criticism. *See, e.g., Indianapolis Colts*

---

[8] During his deposition, Mr. Gelb agreed that a control should not be less attractive than the test stimulus, but rather a "generic version:"

   Q  All right. In selecting a control in an Internet survey as you did here, do you believe or are you of the opinion that you should select a control that shares as many characteristics with the test as possible?

   A  No, I do not believe that.

   Q  Do you believe that the control should be substantially similar to the test?...

   A  Well, I think we probably might have different views. The definition of a control is that it should be substantially similar except that the issue in contention should be made into a generic version....

   Q  Did you consider other controls?

   A  Yes.

   Q  What did you consider?

   A  One that I considered that I quickly discarded was "Warrior's Team."

   Q  Anything else?

   A  There was one other that I thought of, but, again, I needed something more -- more generic.

   Q  More generic than "America's Team"?

   A  Yes.

(Def.'s App. ATAPP000000278-79 at 144:23-146:14.)

[9]   Q  Would you think "Nation's Team" would be an appropriate control?

   A  Absolutely not.

   Q  Why not?

   A  Because you are repeating half of the term, the infringing -- the alleged infringing term.

(Def.'s App. ATAPP000279 at 146:15-20.):

*v. Metropolitan Baltimore Football Club Ltd., P'ship.*, 34 F.3d 410, 415-16 (7th Cir. 1994). In *Indianapolis Colts*, the survey relied upon by the court was testing potential confusion between the defendant's use of Baltimore CFL and plaintiff's "Indianapolis Colts" trademark. The control utilized by the survey for noise was the "Baltimore Horses." The court commended the survey's control study and accepted the survey evidence as probative of actual confusion. *Id.* at 415-16.

In this case, had the Plaintiffs in this case used a more similar control such as "Nation's Team," it would have created a more appropriate control—one sharing characteristics with the experimental stimulus. Instead, Mr. Gelb chose a control bearing no resemblance whatsoever to the trademark being tested, adverse to well-established principles for choosing a proper control that Mr. Gelb, who testified the importance of a control[10] and has had surveys criticized in the past for the failure to utilize a control,[11] is familiar with.

Proof that the control utilized by Mr. Gelb was highly flawed comes from the responses. Approximately 600 respondents, were shown the control "The Best" to test for general background noise. (Def.'s App. ATAPP000258 at 61:1-4.) Of those 600 respondents, only one attributed "The Best" to the Dallas Cowboys. (Def.'s App. ATAPP000187-88.) Such an extremely low fraction, .0017%, further proves the inadequacy of the control chosen for the Gelb survey as there is basically no measurement of noise whatsoever and effectively, no control at all. The inadequate control directly reflects upon the validity of the survey. *See Rivera, supra* at 686.

---

[10] (*See generally* Def.'s App. ATAPP000258, ATAPP000261, ATAPP000278-80.)

[11] *See Ecce Panis, Inc. v. Maple Leaf Foods USA, Inc.*, 2007 LEXIS 85780, *5 (D. Ariz. Nov. 7, 2007) (the control used looked "nothing like the other packages," and thus the court noted "it is hardly indicative of any likelihood of confusion between Plaintiffs' and Defendants' brands;" the court found the survey results therefore did not demonstrate actual confusion as was claimed by Mr. Gelb); *Riviana Foods, Inc. v. Societe Des Produits Nestle, S.A.*, 33 U.S.P.Q.2d at 1671 (the survey was criticized and given little probative value, if any, for deficiencies including the failure to use a control and asked leading questions).

E.     *Plaintiffs' Expert Report Was Not Complete.*

"The completeness of the survey report is one indicator of the trustworthiness of the survey and the professionalism of the expert who is presenting the results of the survey." Diamond, *supra* at 270.  The survey report should contain a description of the target survey universe, as well as a description of the survey universe actually sampled.  *Id.* at 240.  Mr. Gelb conveniently left out of his report his materially significant gender quota and the reasons therefor.  The gender split was revealed only in discovery and during his deposition.  (Def.'s App. ATAPP000262-63 at 78:18-81:25.)  Mr. Gelb claims he did not find it relevant to include in his expert report.  (Def.'s App. ATAPP000264 at 87:23-88:24.)  As addressed above, the 70/30 gender split is highly relevant because the high percentage of males over the age of 18 lead to biased results and an under-inclusive survey universe.  It is also a necessary part of an objective report.  A gender split of this magnitude is part of the methodology and should have been reported for a fair and accurate explanation of the results.

A survey report should also include a description of any "special scoring."  Diamond, *supra*, at 270.  Mr. Gelb described scoring some answers based upon his own interpretive liberties as to what he believed the respondents were thinking.  (*See* Def.'s App. ATAPP000271-72 at 116:72-117:14 ("I think that is an indication of likelihood of confusion... So I think that those two [answers] together comprise both secondary meaning and likelihood of confusion.")  That, like the undisclosed gender split, Mr. Gelb did not address in any manner whatsoever for his interpretive his interpretive scoring that served Plaintiffs as the foundation for adopted statistical finding of confusion.  Mr. Gelb's failure to disclose this highly relevant information is akin to what occurred in *National Football League Enterprises, Inc.*, 57 F. Supp. 2d 665.  There the court reprimanded the surveyor for failing to include information as to the control group after there was evidence in an earlier version of the report that one had been used, noting that it

- 21 -

appeared "logical that he chose not to use it because it is not good news for the plaintiffs." *Id.* at 669 (finding the wide gap between the true results incorporating "even the deeply flawed controls" from the first version of the report and the reported results was "reason enough for the court to exercise its gatekeeping function to exclude the survey evidence"). Mr. Gelb's decision to exclude from his report the highly relevant gender quota and the interpretive liberties be understood to assume that his opinions calls into question the trustworthiness of the survey and further points to a conclusion that it is irrelevant and should be excluded. *See Amstar Corp.*, 615 F.2d at 264.

**CONCLUSION**

Mr. Gelb's survey and report is biased, incomplete, measures the incorrect group, contains inadequate controls, and seeks to conceal critical information. Accordingly, it is not relevant or reliable under Rule 702 and *Daubert* and is much more prejudicial than probative under Rule 403. Accordingly, the Court should exclude Mr. Gelb's report from evidence (including in the Court's consideration of the pending summary judgment motions) and preclude Mr. Gelb from testifying at trial.

Respectfully submitted,

**Date: May 13, 2008**                  **SCHREIMANN & ASSOCIATES, P.C.**

By: s/ Austin H. England
Daniel W. Schreimann, #1781440
Austin H. England, # 06619750
909 Lake Carolyn Parkway, Suite 150
Irving, Texas 75039
(214) 522-6262  Telephone

**WINTHROP & WEINSTINE, P.A.**

Peter J. Gleekel, #0149834
Kyle J. Kaiser, #0345106
*Admitted Pro Hac Vice*

225 South Sixth Street Suite 3500
Minneapolis, Minnesota 55402
(612) 604-6400

Attorneys for Defendant

3796663v3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DALLAS COWBOYS FOOTBALL | § | |
| CLUB, LTD. | § | Civil Action No. 06-cv-01906 |
| and | § | **ECF CASE** |
| NFL PROPERTIES, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| AMERICA'S TEAM PROPERTIES, INC., | § | |
| | § | |
| Defendant. | § | |

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of May, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will forward notification of such filing to the following counsel of record for Plaintiffs:


Levi G. McCathern, II
Margaret R. Mead
McCathern | Mooty, LLP
3710 Rawlins St., Suite 1600
Dallas Texas 75219

Robert L. Raskopf
Jessica A. Rose
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010


**SCHREIMANN & ASSOCIATES, P.C.**

By: s/ Austin H. England
Daniel W. Schreimann, #1781440
Austin H. England, # 06619750
909 Lake Carolyn Parkway, Suite 150
Irving, Texas 75039
(214) 522-6262  Telephone

**WINTHROP & WEINSTINE, P.A.**

Peter J. Gleekel, #0149834
Kyle J. Kaiser, #0345106
*Admitted Pro Hac Vice*

225 South Sixth Street Suite 3500
Minneapolis, Minnesota 55402
(612) 604-6400

Attorneys for Defendant

3807672v1