IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DALLAS COWBOYS FOOTBALL CLUB, LTD. and NFL PROPERTIES, LLC, | § § § § § | Civil Action No. 06-cv-01906 **ECF CASE** |
| Plaintiffs, | § § | |
| v. | § § | |
| AMERICA'S TEAM PROPERTIES, INC., | § § | |
| Defendant. | § § | |

**REPLY BRIEF IN SUPPORT OF AMERICA'S TEAM PROPERTIES, INC.'S MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF GABRIEL M. GELB**

# TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

LEGAL ARGUMENT ............................................................................................................... 1

    I.    LEGAL STANDARD FOR A *DAUBERT* MOTION. ........................................... 1

    II.    MR. GELB'S USE OF A GENDER QUOTA WAS IMPROPER AND BIASED THE RESULTS. ............................................................................................ 2

    III.    MR. GELB'S ATTEMPT TO REDEFINE THE PROPER SURVEY UNIVERSE AND CHANGE ITS SECONDARY MEANING FINDINGS IS IMPROPER AND SHOULD BE STRUCK. ........................................................ 4

    IV.    THE CONTROL UTILIZED BY MR. GELB WAS INADEQUATE ................... 7

    V.    MR. GELB FAILED TO INCLUDE HIGHLY RELEVANT INFORMATION IN HIS REPORT ................................................................... 9

CONCLUSION ....................................................................................................................... 10

# **TABLE OF AUTHORITIES**

Page No.

*Am. Basketball Ass'n v. AMF Voit, Inc.*,
    358 F. Supp. 981 (S.D.N.Y. 1973),
    *aff'd* 487 F.2d 1393 (2d Cir. 1973) ............................................................................... 4-5

*Amstar Corp. v. Domino's Pizza, Inc.*,
    615 F.2d 252 (5th Cir. 1980) ....................................................................................... 6, 10

*Citizens Fin., Group, Inc. v. Citizens Nat'l Bank of Evans City*,
    383 F.3d 110 (3d Cir. 2004) ............................................................................................. 2

*Classic Foods Int'l v. Kettle Foods, Inc.*,
    2006 WL 5187497 (C.D. Cal. Mar. 2, 2006) ................................................................ 7, 8

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ......................................................................................................... 1

*Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*,
    188 F.3d 501 (4th Cir. 1999) ........................................................................................... 2

*In re E.I. Kane, Inc.*,
    221 U.S.P.Q 1203 (T.T.A.B. 1984) ................................................................................. 4

*Moore v. Ashland Chem. Inc.*,
    151 F.3d 269 (5th Cir.1998) ............................................................................................ 2

*Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*,
    198 F. Supp. 2d 474 (S.D.N.Y. 2002) ............................................................................. 8

*Nat'l Football League Props. Inc. v. ProStyle, Inc.*,
    57 F. Supp. 2d 665 (E.D. Wis. 1999) ............................................................................... 2

*S.W.S. Erectors, Inc. v. Infax, Inc.*,
    72 F.3d 489 (5th Cir.1996) .............................................................................................. 6

*Scott Fetzer Co. v. House of Vacuums Inc.*,
    381 F.3d 477 (5th Cir. 2004) ....................................................................................... 1, 6

*Spraying Sys. Co. v. Delavan, Inc.*,
    762 F. Supp. 772 (E.D. Ill. Mar. 22, 1991),
    *aff'd,* 975 F.2d 387 (7th Cir. Sept. 17, 1992) ............................................................... 2, 4

**Rules:**

Fed. R. Evid. 402 ................................................................................................................2

Fed. R. Evid. 403 ....................................................................................................1, 2, 10

Fed. R. Evid. 702 ....................................................................................................1, 2, 10

**Other:**

J. Thomas. McCarthy,
    *McCarthy on Trademarks and Unfair Competition* (4th ed. 2008) .................................1, 6

Diamond, Dr. Shari Seidman
    "Reference Guide on Survey Research,"
    *Reference Manual on Scientific Evidence* (1994) ......................................................4, 6, 7, 9

Rivera, Artemio
    *Testing the Admissibility of Trademark Surveys After Daubert*,
    84 J. Pat. & Trademark Off. Soc'y 661 (2002) ......................................................................9

**INTRODUCTION**

Plaintiffs Dallas Cowboys Football Club, Ltd. ("Dallas Cowboys") and NFL Properties, Inc. ("NFL Properties," collectively, "Plaintiffs") designated report and testimony of Gabriel M. Gelb ("Gelb") contain fatal flaws in the methodology of the survey, calculation of the results, and the disclosures in the subsequent report and recent declaration. These flaws make the results inherently unreliable, not relevant, confusing and a waste of the jury's time.

**LEGAL ARGUMENT**

**I.    LEGAL STANDARD FOR A *DAUBERT* MOTION.**

Plaintiffs claim, without any legal support, that Defendant's argument that Mr. Gelb's secondary meaning findings are too low to be relevant is an improper basis for a *Daubert* motion. However, for expert testimony to be admissible, it must be both reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). Under Federal Rule of Evidence 702, the Court examines whether the expert is initially qualified to give the opinion proposed *and* whether the opinion expressed meets the requirements set forth in *Daubert*— whether it "rests on a reliable foundation and is *relevant to the task at hand*." *Daubert,* 509 U.S. at 591 (emphasis added). The existence of flaws in a survey could affect its reliability and/or relevance to the point of making the survey inadmissible. *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004) (affirming summary dismissal of trademark infringement claim); 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:170 (4th ed. 2008). In addition to Rule 702 and *Daubert*, the Court is to consider the admissibility of the survey under Federal Rule of Evidence 403—whether the probative value of the survey outweighs its prejudicial effect, is a waste of time, or is confusing to the factfinder. Fed. R. Evid. 403. A survey that fails to prove the legal theory it set out to prove is irrelevant and could unduly prejudice a jury who is unaware that such a low percentage does not prove secondary

meaning. *See, e.g., Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 118-21 (3d Cir. 2004) (affirming exclusion of survey and summary judgment on the ground that the probative value of the survey substantially outweighed any unfair prejudice in considering it).

Plaintiffs have not satisfied their burden of proving that Mr. Gelb's expert report is admissible as relevant or reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc) (holding that the proponent of the expert evidence shoulders the burden to prove its admissibility). If the survey results themselves are too low to prove secondary meaning as a matter of law, *see, e.g.*, *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387 (7th Cir. 1992) then the results cannot be relevant for the factfinder to consider, or any minimal probative value that may exist is outweighed by the risk that the factfinder would believe that such results *were* sufficient. Fed. R. Evid. 402, 403.

Plaintiffs' argument that the exclusion of Mr. Gelb's survey would be contrary to the law is wrong. Federal courts have not been reluctant to issue rulings rejecting surveys due to lack of relevance and/or reliability based upon Rules 702, 403 and the *Daubert* factors. *See, e.g.*, *Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*, 188 F.3d 501, 505 (4th Cir. 1999); *Nat'l Football League Props., Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 668-69 (E.D. Wis. 1999). This Court's duty to act as "gatekeeper" presupposes that it exclude the report where, as here, it is unreliable, irrelevant, or not helpful to the jury, and/or the unfair prejudice outweighs any arguably relevant opinions Mr. Gelb may have.

## II. MR. GELB'S USE OF A GENDER QUOTA WAS IMPROPER AND BIASED THE RESULTS.

Mr. Gelb's survey was founded on an undisclosed gender quota to ensure participation by a disproportionate number of adult male respondents based upon the perception that more males than females are fans of the National Football League ("NFL"). This undisclosed gender quota

created an artificial bias meant to skew the results of the survey in favor of the Plaintiffs' legal argument.

Plaintiffs misconstrue Defendant's argument relating to the use of an improper gender quota. Defendant's argument is not that the survey is inherently biased solely because more than 60% of the respondents were men. However, the undisclosed screening performed by Mr. Gelb improperly implemented a 70/30 gender quota in the calculation of responses. This gender quota served as an undisclosed secondary screening level to skew the results to focus on a population most likely to contain fans of the NFL. This quota was based entirely on a Harris Poll that found 63% of those who followed the NFL were male. (Def.'s App. ATAPP000262-63 at 78:18-79:9, 79:23-80:19, 81:2-25.) While Mr. Gelb admitted that he did not attempt to locate data regarding a gender split of fans who follow high school or college athletics (*id.* at 81:9-19), Plaintiffs now claim Mr. Gelb "extrapolated from the Harris Poll's data about the NFL viewership to infer information concerning fans of high-school, college and other professional sports." (Pls.' Br. in Opp'n to Def.'s Mot. to Exclude the Expert Test. and Report of Gabriel Gelb ("Pls.' *Daubert* Opp'n Br.") at 4.) However, not only did Mr. Gelb fail to mention his alleged "extrapolation" in his deposition, he did not explain the gender quota on the basis of projected interest in sports generally, as Plaintiffs have claimed.[1]

Mr. Gelb's decision to utilize a 70/30 gender split based solely on a report indicating adult males were the primary followers of the NFL was improper. Mr. Gelb determined the relevant survey universe to be 18-year-olds who purchased logo-branded clothing in the recent past or would do so in the near future and who followed high school, college, or professional sports. (Def.'s App. ATAPP000179, 181, 183.) All that was required was reliance on the

---

[1]     Plaintiff cites to Gelb's deposition at pages 79-81. However, nowhere in this section does Mr. Gelb explain the gender quota as being based upon an interest in sports generally. Rather, the cited pages discuss the significance of the NFL piece in Mr. Gelb's gender quota.

- 3 -

screening questions disclosed on the face of the survey to obtain the survey universe. But Gelb went one step further, adding a second undisclosed level of "qualification" not necessary for the universe. This demonstrates the bias of the survey.

Also improper was his failure to disclose this split in any of his reports (Def.'s App. ATAPP000264 at 87:25-88:24), although he adamantly testified as to how relevant the split was to his survey. (Def.'s App. ATAPP000263 at 83-87; 84:19-21.) Dr. Shari Seidman Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, (1994) at 270-71. The fact that Mr. Gelb consciously failed to disclose the imposed gender split further proves the survey was intentionally skewed to a particular result and should be excluded.[2]

### III. MR. GELB'S ATTEMPT TO REDEFINE THE PROPER SURVEY UNIVERSE AND CHANGE ITS SECONDARY MEANING FINDINGS IS IMPROPER AND SHOULD BE STRUCK.

In Defendant's Motion to Exclude Expert Gelb, it argued that even if the 25% secondary meaning reported and testified to by Mr. Gelb was calculated correctly, 25% is insufficient to establish secondary meaning in the minds of the consumers. Numerous bodies have found percentages of 25 or more to be insufficient to establish secondary meaning. *See, e.g.*, *Spraying Sys. Co. v. Delavan, Inc.*, 762 F. Supp. 772 (E.D. Ill. Mar. 22, 1991), *aff'd,* 975 F.2d 387 (7th Cir. 1992) (rejecting 38% secondary meaning evidence); *In re E.I. Kane, Inc.*, 221 U.S.P.Q 1203, 1206 (T.T.A.B. 1984) (holding 30.8% insufficient for secondary meaning); *Am. Basketball Ass'n v. AMF Voit, Inc.*, 358 F. Supp. 981, 986 (S.D.N.Y. 1973), *aff'd* 487 F.2d 1393 (2d Cir. 1973) (finding net 42% secondary meaning evidence insufficient); (*see also* Def.'s App. ATAPP1079-83.)

---

[2] The fact that Defendant's expert's survey ended up with a 61% male response rate is completely irrelevant. That survey did not purposely employ a gender split, but was done randomly. Furthermore, while Plaintiffs attempt to trivialize a nearly 10% difference between the male participants in the two surveys, 10% is not trivial in the context of a survey. The gender bias could have skewed the results by a substantial percentage.

- 4 -

Implicitly recognizing the merit of Defendant's argument, and realizing that the figures originally put forth by Plaintiffs may be insufficient to demonstrate secondary meaning as a matter of law, Plaintiffs attempt to redefine the survey universe that Mr. Gelb both defined in his report and specifically testified to in his deposition to be relevant, in an attempt to present this Court with a higher secondary meaning figure. This effort should not be allowed, as in so doing, Mr. Gelb impeaches himself relying upon a predicate not in his report and that is inconsistent with Plaintiffs' theory that all Americans—or at least sports fans nationwide—know the Cowboys as "America's Team."

Mr. Gelb attempts to justify after the fact this new number by changing his definition of the "relevant consumers." Mr. Gelb in his report and in his testimony defined the relevant survey population as "people who had bought or might have seen products by [America's Team] and who were fans of athletic sports." (Def.'s App. ATAPP 000179, 181, 183; ATAPP000247 at 19:9-20.4.) Mr. Gelb admitted in his deposition that this universe was appropriate for *both* likelihood of confusion and secondary meaning testing. (*Id.* (testifying that the secondary meaning universe would be "about the same" as that for likelihood of confusion)).

Now, because the levels of secondary meaning allegedly found by Mr. Gelb were too low, Plaintiffs and Mr. Gelb redefine the critical survey universe to "consumers of officially licensed NFL Cowboys merchandise."³ This represents an improper attempt to contradict a prior statement under oath and is inadmissible for purposes of summary judgment. *S.W.S. Erectors,*

---

³ It is important to note that the Gelb survey did not test at all for a universe of "consumers of officially licensed NFL Cowboys merchandise." Without any explanation whatsoever, or any support from Mr. Gelb in his report or in his deposition, Plaintiffs surmise that if a survey respondent stated that he or she was a past or future purchaser of "logo-imprinted merchandise," and if that same respondent stated that he or she was an NFL fan, and if that person stated that his or her favorite team was the Cowboys, then he or she would purchase Cowboys gear. This is baseless, as there is no reason to assume that someone who purchases "logo-imprinted merchandise," which may include logos advertising one's favorite store, brand, alcoholic beverage, or funny slogan, will wish to purchase *NFL Branded* Logo Merchandise. This unreasonable extrapolation must be excluded from consideration on summary judgment.

*Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir.1996) (noting that a party cannot contradict sworn testimony through affidavit). Furthermore, this newly created extrapolation was not disclosed or considered in Mr. Gelb's report, which is an independent basis for exclusion. Diamond, *supra* at 270-71.

Finally, even if Mr. Gelb's last-minute contradictory position is allowed, and the data used to support this universe is accepted, *cf. supra* n.3, this opinion must be excluded because the newly invented survey is underinclusive. Surveying the relevant universe is critical to the survey, and Mr. Gelb has recognized such in his report. (Def.'s App. ATAPP000183.) A survey must "adequately represent the opinions which are relevant to the litigation." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980). Even assuming for the sake of argument that Plaintiffs are able to separate the relevant universe for secondary meaning purposes from the relevant universe for confusion purposes (which Mr. Gelb has twice denied),[4] Plaintiffs' newly chosen universe is woefully underinclusive. The proper universe for a secondary meaning survey (when a claim of infringement is not considered) must be, at minimum, the class of the consuming public who would purchase Plaintiffs' goods and services. *E.g.*, 2 McCarthy, *supra*, § 15:46. These are not merely those whose *favorite team* is the Dallas Cowboys and who have purchased logoware before. They include all those sports fans, consumers who purchase on behalf of those fans, fans of other teams who may also appreciate a Cowboys player, or many others. In other words, it is the general consuming public. *Cf. id.* (noting that the "consuming public" for secondary meaning purposes need not be the "general public" "if a product is targeted only at a specific segment of the general public"). This is proven by Plaintiffs' request for broad-based injunctive relief against Defendant for any use of

---

[4] *But see Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 487-88 (5th Cir. 2004) (citing *Amstar* and stating that the universe for a secondary meaning search should include a sampling of purchasers "most likely to partake of the alleged infringer's goods or services").

the AMERICA'S TEAM mark, regardless of its connection to sports, their claims of post-sale confusion (which do not involve purchasers), and their largely unsupported claims to describe the "fame" of AMERICA'S TEAM throughout the country. (*E.g.* Pls.' Am. Compl. ¶¶ 2, 6, 21, 22, 26, p. 21 "WHEREFORE" clauses.)

### IV.     THE CONTROL UTILIZED BY MR. GELB WAS INADEQUATE.

Rather than attempt to defend Mr. Gelb's use of an inadequate control "The Best," Plaintiffs attack Defendant's survey control "Nation's Team." An appropriate control should be one that "shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influences is being assessed." Diamond, *supra*, at 258. Plaintiffs claim that Defendant's use of "team" in the control is inappropriate because it contains a term that is the same as one of the terms being tested is without merit. There is no such common-term "rule" regarding controls, and use of the highly descriptive term "team" in the control does not create a similar characteristic to the one being tested.

Plaintiffs' reliance on *Classic Foods International v. Kettle Foods, Inc.*, 2006 WL 5187497, at *4 (C.D. Cal. Mar. 2, 2006) is misplaced. Not only does *Classic Foods International* not stand for the proposition that the control and test mark cannot have any words in common, but it suggests the exact opposite. The mark being tested was KETTLE CLASSICS for chips. The control used by the defendant was CAPE COD OLD FASHIONED KETTLE-COOKED. Plaintiff performed its own survey using the control KETTLE COOKED CLASSICS for the mark KETTLE CLASSICS. While the court criticized both controls, it did not criticize the use of the term KETTLE in either the control or the mark being tested and, in fact, agreed that the word KETTLE may have been too small on the Cape Cod bag to pick up sufficient noise. *Id.* at *5-6.

The fallacy of Plaintiffs' argument is further proven by the fact that Plaintiffs' late designated expert, Mr. Mantis,[5] conducted at least one survey in the past utilizing a control that contained an identical term as the mark being tested. *See Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474 (S.D.N.Y. 2002). In *National Distillers*, Mr. Mantis conducted a survey to test secondary meaning for the defendant. *Id.* at 483. The mark at issue was GLACIER BAY, and the control selected by Mr. Mantis was ARCTIC BAY. *Id.* The court did not criticize Mr. Mantis' control for containing an identical term to the test mark. In fact, the court relied upon Mr. Mantis' survey.

Mr. Gelb chose a control bearing no resemblance whatsoever to the trademark being tested, adverse to well-established principles for choosing a proper control. "The Best" has no affiliation with "America," or even a "Team," much less the overall "America's Team." Certainly, not even Plaintiffs contend that "America's Team" is synonymous with the best team; otherwise the Dallas Cowboys would have lost the title for a large portion of the 1980s, 1990s, and 2000s. Not surprisingly, Plaintiffs have failed to offer any support for the contention that Mr. Gelb's control was adequate. Of those 600 respondents shown Mr. Gelb's control, only *one* attributed "The Best" to the Dallas Cowboys—.0017%. This negligible percentage is probative of the inadequacy of the control chosen for the Gelb survey as there is basically no measurement of noise whatsoever and effectively, no control at all.[6] The inadequate control directly reflects

---

[5] In noting the inherent contradictions from previous studies performed by Plaintiffs' late-disclosed expert, Defendants are in no way waiving their arguments that Mr. Mantis should be struck.

[6] Once again, Defendant is not arguing that the Court look solely to the results to determine the faults in the methodology, but one method to use as a cross-check for the validity of the control is whether any survey taker would choose both the control and the test subject. If the control shares no characteristics with the experimental stimulus, the survey takers will not confuse the control with the test, and there will simply be no noise. For example, in an attempt to ascertain secondary meaning for PETER PAN for peanut butter, an appropriate control would not be HARRY POTTER (even though both are protagonists in children's stories). No noise would be expected to be found because the control and test share no characteristics. While no level of noise is "required" to be found in order for the control to be valid, when no noise is viewed, there are serious questions that the control

upon the validity of the survey. *See* Rivera, Artemio, *Testing the Admissibility of Trademark Surveys After Daubert*, 84 J. Pat. & Trademark Off. Soc'y 661, 686 (2002).

## V. MR. GELB FAILED TO INCLUDE HIGHLY RELEVANT INFORMATION IN HIS REPORT.

"The completeness of the survey report is one indicator of the trustworthiness of the survey and the professionalism of the expert who is presenting the results of the survey." Diamond, *supra* at 270. The survey report should contain a description of the target survey universe, as well as a description of the survey universe actually sampled. *Id*. Mr. Gelb purposely left out of his report his materially significant gender quota and the reasons therefor, a description of his "special scoring" for secondary meaning and likelihood of confusion, and any mention of his new survey universe for secondary meaning. Each of these topics are highly relevant to an expert report based upon a survey conducted to prove the legal issues of a case.

The gender split was revealed only in discovery and during his deposition. (Def.'s. App. ATAPP000262 at 78:18-81:25.) As addressed above, the 70/30 gender split is relevant because the high percentage of males over the age of 18 lead to biased results and an underinclusive survey universe. It is also a necessary part of an objective report. A gender split of this magnitude is part of the methodology and should have been reported for a fair and accurate explanation of the results.

A survey report should also include a description of any "special scoring." Diamond, *supra*, at 270. Mr. Gelb described scoring some answers based upon his own interpretive liberties as to what he believed the respondents were thinking. (*See* Def.'s App. ATAPP 000271-72, at 116:72-117:14.) It was not until his recent declaration changing his claim for secondary meaning where Mr. Gelb explained how he purportedly arrived at his scoring

---

chosen by Mr. Gelb in this case is more like HARRY POTTER for PETER PAN than a legitimate control where no noise was recorded.

(notably, the scoring utilized to arrive at the 25% secondary meaning number NOT the more recent 56% finding).

Finally, as discussed above, Mr. Gelb's report did not contain any mention whatsoever to a redefined contradictory survey universe for the new undisclosed determination of secondary meaning based upon a universe of persons who consider themselves to be Cowboys fans.

Mr. Gelb's decision to exclude from his report the highly relevant information calls into question the trustworthiness of the survey and further points to a conclusion that it is irrelevant and should be excluded. *See Amstar Corp.*, 615 F.2d at 264.

### CONCLUSION

Mr. Gelb's survey and report is biased, incomplete, contains inadequate controls, and seeks to conceal critical information. Accordingly, it is not relevant or reliable under Rule 702 and *Daubert*, and its prejudice outweighs its probative value. Accordingly, the Court should exclude Mr. Gelb's report from evidence (including in the Court's consideration of the pending summary judgment motions) and preclude Mr. Gelb from testifying at trial pursuant to Rules 403, 702 and *Daubert*.

Date:  June 23, 2008
**WINTHROP & WEINSTINE, P.A.**

By:   Kyle J. Kaiser
Peter J. Gleekel
Kyle J. Kaiser
Admitted *Pro Hac Vice*,
225 South Sixth St. Ste. 3500
Minneapolis, MN 55402
(612) 604-6400
Attorneys for Defendant
3879661v2

Respectfully submitted,
**SCHREIMANN & ASSOCIATES, P.C.**

Daniel W. Schreimann, #1781440
Austin H. England, # 06619750
909 Lake Carolyn Parkway, Suite 150
Irving, Texas 75039
(214) 522-6262  Telephone