IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DALLAS COWBOYS FOOTBALL CLUB, LTD. and NFL PROPERTIES, LLC, | § § § | |
| | § | CIVIL ACTION NO. |
| Plaintiffs, | § | |
| | § | 3:06-CV-1906-K |
| v. | § | |
| | § | |
| AMERICA'S TEAM PROPERTIES, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are a Motion for Summary Judgment and a Motion to Exclude from Evidence the Reports, Affidavit and Testimony of Defendant/Counter Claimant's Expert Witness James T. Berger by Plaintiffs Dallas Cowboys Football Club, Ltd. and NFL Properties, LLC (Doc. Nos. 61 and 62) and a Motion to Exclude the Expert Report and Testimony of Gabriel M. Gelb and a Motion for Partial Summary Judgment by Defendant America's Team Properties, Inc. (Doc. Nos. 64 and 66). Because Plaintiffs' rights in the term "America's Team" are superior to Defendant's claims, Plaintiffs' motion for summary judgment is **GRANTED**. Consequently, the Court **DENIES** Defendant's motion for partial summary judgment.

Because the Court finds Plaintiffs' expert survey to be sufficiently reliable under Federal Rule of Evidence 702 and "minor methodological flaws will affect weight rather than admissibility," *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 488 (5th Cir.

2004), Defendant's Motion to Exclude is **DENIED**.  Because the Court would rule for Plaintiffs even if the expert report to which they object is considered, Plaintiffs' Motion to Exclude is **DENIED as moot**.

## I.      Factual and Procedural Background

Plaintiff Dallas Cowboys Football Club, Ltd. ("Dallas Cowboys" or "Cowboys") is the National Football League ("NFL") franchise in the Dallas, Texas, metropolitan area.  Plaintiff NFL Properties, LLC, ("NFLP") is the marketing arm of the thirty-two NFL member clubs.

Defendant America's Team Properties, Inc. ("ATP"), is a Minnesota corporation with its principal place of business in Burnsville, Minnesota.   Defendant was incorporated in 1998 to take assignment of U.S. Trademark Reg. No. 1,899,914 (for "clothing; namely, shirts") and exploit the mark commercially.

The '914 trademark registration was originally applied for by Terrence Nash ("Nash"), president and owner of MEOB, Inc. ("MEOB"), in June 1990, and was sold to ATP in 1998.  In his intent-to-use application with the United States Patent and Trademark Office, Nash submitted a sworn declaration stating that he was unaware of any other person or firm that had the right to use the mark in commerce.  Nash has stated he intended to sell one million t-shirts at $1 profit each to pay for his children's education.  The '914 trademark was granted to MEOB in 1995.

Nash states that he sold or gave away t-shirts printed with "America's Team" at

various sporting events and while traveling as a salesman.  He received a license from the University of Washington and sold co-branded t-shirts outside Husky Stadium in 1990. He also licensed use of "America's Team" to a recreational league softball team in Texas. Nash claims he was completely unaware that the Dallas Cowboys, or any other entity, was referred to as "America's Team" at this time.

Nash claims a few sales between 1990 and 1994.  In 1994, he sold t-shirts to four businesses.  As a result of the registration and these sales, Defendant asserts it has a nationwide priority date of June 6, 1990, and the mark has been continually used in commerce since 1995.  Thereafter, Nash spoke with many entities about potential licensing deals, including Nike, Reebok, and L.A. Gear, but none came to fruition.

Defendant ATP purchased the trademark from MEOB, Inc., in 1998 for $100. Defendant asserts that this figure included the assumption that would be forced to spend an additional $100,000 in litigation costs defending the mark.  As part of the deal, MEOB's president and owner Brian Reichel ("Reichel") agreed to give Nash 49 percent of the proceeds from any subsequent sale of the registration.  On May 14 and May 17, 1999, Defendant ran advertisements in the *USA Today* newspaper to auction the "America's Team" registration to the highest bidder with a minimum bid of $500,000. America's Team Properties also called the Dallas Cowboys to notify the team that the registration was up for sale.  Defendant also contacted the team in October, November, and December 2003 to offer to sell the registration for $400,000.  The Cowboys refused

to pay.

Since purchasing the registration, ATP has sold clothing and assorted goods through its website, www.americasteamusa.com.  Its "primary focus" has been to create a website and social networking site to promote the "America's Team Award" to "provide a four-year, full-ride scholarship to one high school team every year."

The Dallas Cowboys and NFLP filed this suit alleging Defendant ATP's actions infringe their common law rights in the trademark and their state trademark registration. The Cowboys assert that "America's Team" is a protectable mark and that the team has priority over America's Team Properties, Inc.  Plaintiffs assert that "Defendant is a bad-faith infringer whose increasingly aggressive and harassing activities pose a significant threat to the business concerns of the Dallas Cowboys."

Defendant ATP filed a counterclaim against the Dallas Cowboys and NFLP, seeking a declaratory judgment that its registration is valid and that the Cowboys have no use priority, and further seeks cancellation of the Cowboys' state trademark registration in Texas.

The Cowboys assert the team has used "America's Team" as a service mark and trademark since 1979.  The term was first used in commerce that year as the title of the Dallas Cowboys' 1978 season highlight film.  The term was coined by Bob Ryan, an executive at NFL Films, working with Doug Todd, the Cowboys' public relations director.  The name stuck, and the Cowboys actively encouraged its use to promote the

- 4 -

team.   The Cowboys allow sponsors, promoters, and charities to use the term in promotions.

Other examples abound of use in connection with the Dallas Cowboys.  A 1979-1980 calendar sold by the Cowboys to the public used the term.  In the 1980s, NFL Films sold a videocasette titled "America's Team: The Dallas Cowboys 1975-1979." Between 1986 and 1990, a NLFP licensee sold silver coins with the term engraved on them.  The team used the term in various publications throughout the 1980s and 1990s. And since at least 1989, the Cowboys have used the term in presentations and sales pitches to potential sponsors and business partners.

By at least 1991, the Cowboys sold t-shirts emblazoned with the term.  The team notes that the first use in commerce by MEOB and Nash was January 1995.  The team argues that by this time, the term had been long associated with the Dallas Cowboys and had been used in commerce on sweatshirts, trading cards, belt buckles, and other items for years.

On October 30, 1992, the Dallas Cowboys obtained Texas trademark registration No. 5223517 for "Dallas Cowboys America's Team" for use on clothing.  Since 1995, the Cowboys have made millions of dollars selling "America's Team" items including apparel, glassware, flags, blankets, towels, pins, footballs, toys, and holiday ornaments. The team has sold the items through various retail outlets, including thirty-three Official Dallas Cowboys Pro Shops in malls and airports, at Texas Stadium, a merchandise

trailer, through catalogs, and on the Internet.  The Cowboys also sell "America's Team" items through wholesalers and license its use to various manufacturers.

Since December 2003, Defendant has filed fifty-eight trademark applications with the USPTO for various uses of "America's Team" and related indicia.  The Cowboys and NFLP have opposed many of the applications before the USPTO Trademark Trial and Appeal Board ("TTAB"), and the TTAB proceedings are suspended pending the outcome of this action.

Plaintiffs seek summary judgment on seven claims: declaration of noninfringement and nondilution, federal unfair competition, federal dilution, injury to business reputation or trademark under Texas law, common law trademark infringement, common law unfair competition, and further seek cancellation of Defendant's trademark registration.  Defendant moves for summary judgment on all Plaintiffs' claims, with the exception of Plaintiffs' declaratory claims.  Defendant's counterclaims are not the subject of the instant summary judgment motions.

## II.     Legal Standard

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact. *Celotex*, 477 U.S. at 322–25. Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted; the nonmovant may not rest upon the allegations in the pleadings, but must support the response to the motion with summary judgment evidence showing the existence of a genuine fact issue for trial. *Id*. at 321–25; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–57 (1986). All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

III.    **Analysis**

A trademark is "any word, name, symbol, or device, or any combination thereof . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. The main purpose of the cause of action for trademark infringement is to "secure the owner of the trademark the goodwill of his business and to protect the ability of consumers to distinguish among competing products." *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002).

To prevail on its trademark infringement claim, Plaintiffs must show that Defendant's use of the "America's Team" mark creates a likelihood of confusion in the minds of potential consumers as to the "source, affiliation, or sponsorship" of the

merchandise.  *See Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998); *Society of Fin. Exam'rs v. National Ass'n of Certified Fraud Exam'rs*, 41 F.3d 223, 227 (5th Cir. 1995); *see also* 15 U.S.C. §§ 1114(1), 1125(a)(1)(A).  "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Elvis Presley Enters.*, 141 F.3d at 193.  The Fifth Circuit has consistently used a nonexhaustive list of factors to determine whether a likelihood of confusion exists. *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir. 1975).  These "digits of confusion" are: (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion.  *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663 (5th Cir. 2000), *Pebble Beach Co. v. Tour 18 Ltd.*, 155 F.3d 526, 543 (5th Cir. 1998).  No single factor is dispositive, and a finding of a likelihood of confusion does not require a positive finding on a majority of the "digits of confusion." *Westchester Media*, 214 F.3d at 664.  A court is also free to consider other relevant factors in determining whether a likelihood of confusion exists.  *Id.*

The Court, in examining the infringement claims, must first determine whether the Cowboys' "America's Team" mark is protectable and whether the Cowboys have use priority over Defendant.  If this is shown, the Court must assess then assess the likelihood of confusion based on the relevant factors in the Fifth Circuit.  On the

dilution claims, the Court must determine whether the Cowboys' mark is famous and distinctive and whether Defendant's actions blur or tarnish Plaintiffs' mark.

### A.     The Dallas Cowboys have Trademark Priority

It is a fundamental premise that "[t]he exclusive right to a trademark belongs to one who first uses it in connection with specified goods." *Blue Bell v. Farah Mfg., Inc.*, 508 F.2d 1260, 1265 (5th Cir. 1975). Proof of registration of a trademark is only prima facie evidence of the registrant's exclusive right to use the mark in commerce for the services specified in the registration. 15 U.S.C. § 1115(a). Such proof does "not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered." *Id.* Therefore, the registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration, and the challenger must overcome this presumption by a preponderance of the evidence. *Sengoku Works Ltd. v. RMC Intern., Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996).

Although "America's Team" is only a nickname for the Dallas Cowboys, such informal references can connote a strong association with a particular team. *See Texas Tech Univ. v. Spiegelberg*, 461 F. Supp. 2d 510 (N.D. Tex. 2006) (finding nicknames and slogans protectable). To establish public identification of a mark with a product or service, a court may look to use of the mark in "advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications," *T.A.B. Systems v.*

*Pactel Teletrac*, 77 F.3d 1372, 1375 (Fed. Cir. 1996), and media outlets such as television and radio, *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 1125 (Fed. Cir. 1985).  In addition, courts have recognized that "abbreviations and nicknames of trademarks or names used only by the public give rise to protectable rights in the owners of the trade name or mark which the public modified."  *Nat'l Cable Television Assoc. v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1577 (Fed. Cir. 1991).

In a section helpfully titled "Federal registration does not cut off the pre-existing common law rights of others," Professor McCarthy explains: "Neither application for nor registration of a mark at the federal level wipes out the prior nonregistered, common law rights of others.  The nonregistered rights of a senior user continue and are not erased by the later federal registration of a junior user."  2 MCCARTHY, *supra* § 16:18.50. "Thus, in a priority dispute between a senior common law user and a second-in-time [intent-to-use] applicant, the senior common law user will prevail."  *Id.*

To establish priority, a mark must be used in a bona fide sale to create an impact on the buying public.  2 MCCARTHY *supra* § 16.7.  "Nominal or token sales to relatives and personal friends do not constitute a bona fide commercial use of a trademark."  *Id.* Secretive and non-open transactions are not proper usage, as the relevant class of prospective buyers is not exposed to the mark.  *Id.*  The Lanham Act specifically provides that "a mark shall be deemed to be in use in commerce . . . when it is placed in any manner on the goods . . . and the goods are sold or transported in commerce."  15 U.S.C.

§ 1127.

It is undisputed that the Dallas Cowboys' use of "America's Team" extends back to 1979. Defendant agrees that, at a minimum, the Cowboys used "America's Team" in connection with a video, a calendar, and a set of coins between 1979 and 1991. Defendant argues that "Plaintiffs have demonstrated only that the term 'America's Team' was applied to the title of a movie in 1979, to an unidentified number of coins in 1981 (discontinued a few years later), and on one year's calendar, in ten years." Def.'s Resp. at 5. Defendant's complaint, then, is that the Cowboys did not use the term in connection with clothing prior to Defendant's use rather than a true priority argument.

Plaintiffs show a broad swath of references throughout the popular and sporting press that refer to the Dallas Cowboys as "America's Team." Defendants counter with examples of the term used in connection with other teams, like the NFL's Pittsburgh Steelers and baseball's Atlanta Braves. The comparison to the Steelers falls short, however. The NFLP is responsible for marketing that team as well, yet only asserts a claim to the term "America's Team" in connection with the Dallas Cowboys. Further, there is no evidence of the Braves or any other organization actively promoting themselves as "America's Team." Many newspaper stories or columns referencing the "real" America's Team often include a swipe at the Cowboys. The term "America's Team" is used derisively when, as in the most recent season, the Cowboys failed to live

up to overhyped potential.  As Defendant notes, the Plaintiffs' use of the term "waxes and wanes, largely with the success of the football team on the field."

But simply asserting that Plaintiffs have not made full use of the term does nothing to extinguish their priority.  "A serious trademark holder is assiduous in endeavoring to convince dictionary editors, journalists and columnists, judges, and other lexicographically influential persons to avoid using his trademark to denote anything other than the trademarked good or service." *Ill. High Sch. Ass'n v. GTE Vantage, Inc.*, 99 F.3d 244, 246 (7th Cir. 1996) (Posner, J.).  Even if a plaintiff is "not assiduous," such inaction is only relevant to an affirmative defense of laches—not an initial determination of trademark priority.  *See id.*  Neither party has briefed or argued laches in this context. Further, the Fifth Circuit has held that any time lapse after a trademark plaintiff issues a cease and desist letter to the defendant does not count for the purposes of laches.  *See Elvis Presley Enters.*, 141 F.3d at 205.

It is clear that the Dallas Cowboys acquired common law rights in the "America's Team" mark more than a decade before Defendant's predecessor in interest.  Thus, the Cowboys have trademark priority.

### B.    "America's Team" is Protectable

A plaintiff seeking to establish that it is entitled to protection from infringement by junior users must demonstrate that its mark is protectable, a threshold requirement that "must be satisfied before infringement can be actionable." *Elvis Presley Enters.*, 141

F.3d at 194.  To prove trademark infringement under 15 U.S.C. § 1125(a), a court must first determine if the mark qualifies for protection.  *Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 425 (5th Cir. 1986).  To make this determination, a court must look at the functionality, distinctiveness, and secondary meaning of the marks.  A mark is protectable if it is either 1) inherently distinctive, or 2) has become distinctive through a secondary meaning.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).

A product is inherently distinctive if its "intrinsic nature serves to identify a particular source."  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000).  The Supreme Court has found "word marks that are 'arbitrary' ('Camel' cigarettes), 'fanciful' ('Kodak' film), or 'suggestive' ('Tide' laundry detergent) are held to be inherently distinctive."  *Id.* at 210–11 (citing "the now-classic test originally formulated by Judge Friendly"); *see Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10–11 (2d Cir. 1976).  A mark may acquire distinctiveness if it develops secondary meaning, that is, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself."  *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, n.11 (1982).

"[T]rademark law requires a demonstration of secondary meaning only when the claimed trademark is not sufficiently distinctive of itself to identify the producer."  *Two Pesos*, 505 U.S. at 767 (internal citations omitted).  A mark has become distinctive

through secondary meaning where it "has come through use to be uniquely associated with a specific source." *Id.* at n.4.  To show secondary meaning, the party claiming infringement must show that the primary significance of the mark is to identify the source of the product rather than the product itself. *Id.*; *Wal-Mart Stores*, 529 U.S. at 210.

The Dallas Cowboys do not claim to have a registered federal trademark for the term "America's Team."  Instead, the team says, it registered "Dallas Cowboys America's Team" under Texas state law in 1992, alleging a first-use date of November 1, 1991, and acquired a common law trademark in the term "America's Team" through longstanding and consistent use in commerce since 1979.

Defendant lists several NFL teams as being described in various media as "America's Team," including the New England Patriots, Green Bay Packers, Chicago Bears, and New Orleans Saints.  Defendants also cite references outside the NFL to the Atlanta Braves, New York Yankees, Air Force Academy football team, Army football team, Los Angeles Lakers, Chicago Bulls, George Mason University basketball team, Colorado Avalanche, Golden State Warriors, Utah Utes, Anaheim Angels, Arizona Diamondbacks, "and countless others." Def's Br. at 15.  The implication is that, at least with regard to sporting teams, the term "America's Team" depends on the success of the squad and the national mood.

Conversely, Defendant claims that *its* use of "America's Team" on clothing and

for charitable purposes is not descriptive and is inherently protectable because it fields no actual team.  Defendant appeals to the dictionary in an attempt to show the mark is simply descriptive.  "Adding the adjective 'America's' simply describes the team—a team of American origin."  Def's Br. at 15.  If this is so, Defendant undercuts its own claim to the trademark by asserting the mark is generic and applies to any "team" in the nation.  *See Two Pesos*, 505 U.S. at 768 ("[G]eneric marks . . . are not registrable as trademarks.").

There is no argument that Plaintiffs' mark is functional.  The question then is whether the Cowboys' mark is inherently distinctive.  *See Two Pesos*, 505 U.S. at 769.  Plaintiffs assert that the mark is inherently distinctive because it is suggestive.  The mark is suggestive, Plaintiffs state, "because it hints that the goods and services offered under the mark are sports-related, but does not refer to football or to the fact that the Cowboys are located in the Dallas area."  Pls.' Brief at 22.  Defendant argues that the Lanham Act prohibition on geographically descriptive marks, including "America," necessarily precludes protection absent a showing of secondary meaning.  *See* 15 U.S.C. § 1051(e)(1).

A "hint" is not enough to make the mark clearly suggestive.  A team is almost by definition "sports-related."  The mark does not indicate that the "team" in question is located in Dallas, however, arguably making at least part of the mark suggestive.  A suggestive mark is one that is "neither exactly descriptive on the one hand nor truly

fanciful on the other." *Abercrombie & Fitch*, 537 F.2d at 10.  To this end, the Cowboys mark is not "exactly descriptive," but not as suggestive as "Tide" laundry detergent, for instance.  *See Wal-Mart Stores*, 529 U.S. at 210 (citing Tide as a suggestive word mark that "may invoke positive connotations in the consumer's mind").

In any event, the suggestiveness of the Cowboys' "America's Team" mark is thin at best, therefore warranting an examination of possible secondary meaning.  The Fifth Circuit has stated that secondary meaning can be proven by evidence of (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress.  *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 541 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32-33 (2001).

Courts have held that words, colors (green-gold dry cleaning press pads), shapes (the Coca-Cola bottle), sounds (NBC's distinctive three chimes), and smells (the aroma of plumeria flowers on sewing thread) may be trademarks if they have gained secondary meaning.  *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 162 (1995).

Plaintiffs here argue that the Cowboys' use of "America's Team" has acquired such secondary meaning among consumers.  The Court agrees.  Several factors weigh heavily.  First, the length and manner of use show the Cowboys have self-identified as

"America's Team" since 1979 in a variety of contexts and across a range of products. Although the volume of sales is not clearly established prior to the 1990s, apparently due to changes in personnel and poor record-keeping, the Cowboys' sales far outstrip Defendant's.  And the mark's use in newspapers and magazines, evidenced by the summary judgment record, reflects consistent and longstanding references to the Cowboys as "America's Team"—even when the author is attempting to apply the label to another franchise.  Finally, Defendant's intent in copying the trade dress is particularly damaging.  Defendant has attempted to capitalize on the Cowboys' fame, even seeking to auction "one of this country's most recognizable trademarks."

Thus, the Court finds the Cowboys' "America's Team" trademark is protectable.

## C.    Digits of Confusion

Likelihood of confusion is the central evidentiary test for infringement under the Lanham Act and unfair competition under Texas common law.  *See Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663 n.1 (5th Cir. 2000); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258–59 (5th Cir. 1980).  The likelihood-of-confusion test requires a plaintiff to show that a defendant's use of its mark "creates a likelihood of confusion in the minds of potential consumers as to the 'source, affiliation, or sponsorship'" of that defendant's services.  *Westchester Media*, 214 F.3d at 663 (citations omitted).  Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion."  *Id.* at 663–64.

- 17 -

To determine whether a use can result in consumer confusion, the Fifth Circuit considers the "a long list of non-exclusive, non-dispositive factors" known as the "digits of confusion." *Lyons Partnership v. Giannoulas*, 179 F.3d 384, 388 (5th Cir. 1999). These factors include (1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998). These digits of confusion "do not apply mechanically to every case and can serve only as guides, not as an exact calculus." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 484–85 (5th Cir. 2004). A court should "consider the application of each digit in light of the specific circumstances of the case," *id.*, and "different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.3d 214, 218 (5th Cir. 1985).

If the likelihood-of-confusion test is closely balanced, the question should be resolved in favor of the senior user. *See* 3 MCCARTHY § 23:64 ("The burden of proof is always on the plaintiff, but when the evidence is weighed and the scales balance equally, the doubt is resolved in favor of the party who has built up *valuable* rights in the mark.") (emphasis added).

Plaintiffs assert that Defendant's use of "America's Team" infringes the Cowboys'

trademark under each of three theories of consumer confusion.  Plaintiffs say it may cause consumers to believe the Defendant is sponsored or endorsed by the Cowboys. *See Pebble Beach*, 942 F.Supp. at 1541.  Or it may cause "initial interest confusion" by attracting consumers who are looking for Cowboys merchandise.  *See Elvis Presley Enters.*, 141 F.3d at 202.  Or it may result in "post-sale confusion" when consumers wrongly identify the original source of the product.  *See U.S. v. Yamin*, 868 F.2d 130, 133 (5th Cir. 1989) ("A trademark holder's ability to use its mark to symbolize its reputation is harmed when potential purchasers of its goods see unauthentic goods and identify these goods with the trademark holder.  This harm to trademark holders is no less serious when potential purchasers encounter these goods in a post-sale context.").

A determination of a likelihood of confusion under federal law is sufficient to prove trademark infringement under Texas law.  *Elvis Presley Enters.*, 141 F.3d at 193.  It is also sufficient to prove unfair competition under the common law and under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  *Pebble Beach*, 942 F.Supp. at 1554.

### 1.    The Type of Marks

The first factor, analyzing the type of marks involved, requires the Court to weigh the asserted marks. "[T]he strength and distinctiveness of [a] plaintiff's mark is a vital consideration in determining the scope of protection it should be accorded." *Amstar*, 615 F.2d at 259.

- 19 -

The strength of a mark refers to its ability to identify the source of the goods being sold under its aegis. *See Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 123 (2d Cir. 2001). The degree to which a senior user's mark is entitled to protection depends on whether the mark is classified as generic, descriptive, suggestive or fanciful/arbitrary. "The stronger the mark, the greater the protection it receives because the greater the likelihood that consumers will confuse the junior user's use with that of the senior user." *Elvis Presley Enters.*, 141 F.3d at 201 (citations omitted). The strength of a trademark involves two components: its inherent or intrinsic distinctiveness and the distinctiveness it has acquired in the marketplace, i.e., its commercial strength. *See Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 130-31 (2d Cir. 2004). "[I]nherent distinctiveness, examines a mark's theoretical potential to identify plaintiff's goods or services without regard to whether it has actually done so . . . [A]cquired distinctiveness, . . . looks solely to that recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services." *Id.*

The parties agree that the Cowboys' "America's Team" mark is not fanciful or arbitrary. As noted, the Court finds the mark is somewhat suggestive and has definitely acquired secondary meaning. Thus, Plaintiffs' mark is relatively strong.

## 2.    Similarity between the Two Marks

The degree of similarity between marks "is determined by comparing the marks' appearance, sound, and meaning." *Elvis Presley Enters.*, 141 F.3d at 201. "Even if

prospective purchasers recognize that the two designations are distinct, confusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users." *Id.* Thus, "[t]he relevant inquiry is whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated." *Id.*

When comparing marks, "it is the overall impression that counts," *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 502 (5th Cir. 1979), "rather than simply comparing individual features of the marks," *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980). "Of course, few would be stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." *Baker v. Master Printers Union of N.J.*, 34 F. Supp. 808, 811 (D. N.J. 1940).

The two marks contain the identical wording: "America's Team." Defendant counters that the Cowboys' use of the mark includes the use of a star logo and the words "Dallas Cowboys," thereby distinguishing the two marks. Yet in the *World Carpets* case, the inclusion of the word "World" in the two marks did not make them substantially similar. *World Carpets*, 597 F.2d at 502. In the same vein, if the marks here both only contained the word "America" there would be no substantial similarity on that basis. For instance, "America's Team" is very different from, say, "Bank of America." But

because both marks in this case use "America's Team," it is hard to plausibly suggest that the "overall impression" is very different.  The use of stars in connection with America's Team Properties' merchandise, for instance on a baseball cap produced by the company, invokes even greater similarity.

An analysis under this factor shows the two marks are strikingly similar, even if their usage is not identical.  The similarity in the appearance and meaning of the marks shows prospective purchasers are likely to believe the parties are somehow associated.

### 3.        Similarity of the Products or Services

In evaluating the similarity of products or services, exact similarity is not required. "The greater the similarity between the products and services, the greater the likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 202.  There may be a likelihood of confusion even if the parties are not direct competitors.  *Id.; Professional Golfers Ass'n of America v. Bankers Life & Cas. Co.*, 514 F.2d 665, 669 (5th Cir. 1975) ("This court has repeatedly held that direct competition is not the sine qua non of trademark infringement; rather the gist of the action lies in the likelihood of confusion to the public.").  A court may find similarity if a product falls within a senior user's natural zone of expansion.  *See Westchester Media*, 214 F.3d at 666–67.

Plaintiffs' evidence compares two baseball-style caps, one produced by Plaintiffs and the other by the Defendant.  The Plaintiffs' cap is blue and white with stars on the front and bill.  A patch on the back contains another star and the words "America's

- 22 -

Team" over a truncated red, white, and blue American flag. "Dallas Cowboys" appears on the patch below the flag. Defendant's cap is red and blue with white stars extending from the side down onto the bill. "America's Team" is written in script on the front. Although the Plaintiffs' cap is primarily blue and white and Defendant's cap is primarily red and blue, both feature five-pointed stars on the bill, the words "America's Team," and the same overall color scheme. A consumer spending just a minute or two contemplating the purchase of a ball cap could be readily confused.

America's Team Properties began giving trophies to sports teams in 1996, "celebrating integrity, sportsmanship, teamwork, excellence and achievement." This "America's Team Award" has since been given to the Florida Gators college basketball team and the Pittsburgh Steelers NFL franchise, among others, although it is unclear whether these teams actually accepted the honor.

Here, the products and services offered by the parties are similar enough to confuse consumers. Although ATP does not field an actual sporting squad, it offers apparel bearing the "America's Team" mark. And venturing directly into NFL football-related areas with the "America's Team" award only increases the likelihood of consumer confusion.

### 4.    Identity of Retail Outlets and Purchasers

"Dissimilarities between the retail outlets for and the predominant consumers of [the parties'] goods lessen the possibility of confusion, mistake, or deception." *Amstar*

- 23 -

*Corp.*, 615 F.2d at 262.    Differences in the parties' customer bases can lessen the likelihood of confusion. *See Exxon*, 628 F.2d at 505–06; *Amstar*, 615 F.2d at 262.

Plaintiffs assert there is "complete overlap" in the retail outlets used and targeted by the parties to distribute products bearing the "America's Team" marks.    The Cowboys' goods are sold on the Internet primarily through the team's online store and nflshop.com.  The Cowboys' goods also are sold through national retailers.  Defendant's goods have been offered for sale primarily through its website, americasteamusa.com, with the hope of distributing through retailers.

"The Internet" is simply too broad to assert complete overlap of retail outlets; it is akin to saying "stores" or "distributors."  Nevertheless, it is indicative of at least some overlap.  Expansion into traditional brick-and-mortar retailers, as Defendant's business plans indicate, would only increase this similarity.

### 5.    Identity of the Advertising Media Used

"[T]he greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion." *Quantum Fitness Corp.*, 83 F.Supp. 2d at 827.

The summary judgment evidence shows that Defendant advertises its business on its website, sends solicitation letters, makes marketing presentations, sponsors sports teams, and has advertised on BostonGlobe.com and in *USA Today*.  The Cowboys advertise on their own website, through their official pro shops, and in marketing

presentations, and through television, the Internet, and elsewhere.

As the Dallas Cowboys are a nationally popular sports franchise, the zone of advertising is nationwide, but is especially concentrated in the north Texas area. Defendant's marketing approach appears heavily dependent on the Internet, through press releases and its web site, which necessarily overlaps with the Cowboys' online efforts.  There is no indication that Defendant has specifically targeted the Cowboys' home market, aside from some activity at a Super Bowl in Houston (the home market of the NFL's Houston Texans).  The national and international scope of Internet marketing necessarily creates some substantial overlap in the marketing approaches, meaning an analysis under this factor tilts slightly toward the Cowboys.

### 6.    Defendant's Intent

A defendant's intent to deceive buyers is an additional factor to be considered in determining a likelihood of confusion.  *Tex. Motor Exch.*, 628 F.2d at 506 (citation omitted).  If "a plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'"  *Id.* (quoting RESTATEMENT OF TORTS § 729, cmt. f (1938)).  A defendant's intent is "a 'critical factor' in determining whether there is a likelihood of confusion."  *Westchester Media*, 103 F. Supp. 2d 935, 956 (S.D. Tex. 1999) *rev'd on other grounds*, 214 F.3d 658 (5th Cir. 2000).

The evidence on Defendant's intent strongly supports Plaintiffs' claims that it

- 25 -

intended to derive benefit from the reputation of the Dallas Cowboys.  Just six months after obtaining its federal trademark registration, MEOB attempted to license the mark to the Cowboys.  Similarly, ATP's assertion that it only seeks to develop its own brand rather than capitalize on the success of the Cowboys fails to persuade the Court.  Just prior to its 1999 attempt to auction the "America's Team" trademark registration for a minimum $500,000 bid, Defendant contacted the Cowboys to inform them the registration was up for sale.  Defendant again contacted the Cowboys in 2003, having lowered its asking price to $400,000.

This act is similar to the situation in *Westchester Media*.  There, a trademark registrant attempted to sell its "Polo" mark to designer Ralph Lauren.  *Westchester Media*, 103 F. Supp. 2d at 962–63.  The district court found that the offer to sell indicated the infringer "hope[d] to capitalize on the reputation and goodwill" of the famous designer. *Id.* at 962.

The strong inference then is that ATP is effectively squatting, akin to so-called "cybersquatters" who register a domain name on the World Wide Web in the hope of selling it at an inflated price to a legitimate business by the same name.  Defendant's only interest appears to be to cash in on the notoriety of the Cowboys.  In contrast, the Cowboys and NFLP actually use the name "America's Team."

## 7.    Actual Confusion

Although not necessary to find a likelihood of confusion, the best evidence of

likelihood of confusion is provided by evidence of actual confusion.  *Roto-Rooter*, 513 F. at 46.  "To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion or consumer surveys." *Scott Fetzer Co.*, 381 F.3d at 486 (citations omitted).  A plaintiff hoping to establish that a likelihood of confusion exists in an infringement action, may utilize the following methods of proof: "(1) survey evidence, (2) evidence of actual confusion, or (3) arguments based on a clear inference arising from a comparison of the conflicting marks and the context of their use." 3 MCCARTHY § 23:10.

Two important factors affect the weight to be granted to surveys: the format of the questions and the manner of conducting the survey.  *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 447 (5th Cir. 1973).  Plaintiffs present a survey by Gabriel Gelb ("Gelb") demonstrating that 19 percent of respondents nationwide believed that the Cowboys produced Defendant's "America's Team" cap or that Defendant needed the Cowboys' permission or approval to make the cap.  In the Dallas area, that number jumped to 39 percent of respondents, reflecting the football team's strength in its home market.  These percentages are within the range accepted by courts—generally 15 percent—in assessing likelihood of confusion.

Defendant presents a survey by James Berger ("Berger"), which states that Gelb's study is a "secondary meaning study only and not a likelihood of confusion study." Berger found only 6.8 percent of respondents associated "America's Team" with the

Dallas Cowboys and determined a net likelihood of confusion of less than 1 percent. Berger concludes, "In my opinion, the American public does not view the Dallas Cowboys as 'America's Team' . . . the American public has no universal perception of an entity known as 'America's Team.'" Berger's findings place the secondary meaning and likelihood of confusion outside the percentages accepted by courts in cases assessing survey results. Notably, even in Berger's survey, respondents chose the Dallas Cowboys more than any other professional sports franchise when presented with an "America's Team" baseball cap.

Essentially, the parties have presented dueling reports, prepared by experts qualified to produce them. Each side then objects to the other's expert report. The Court, examining the survey methodologies and findings, finds both surveys are "of a type reasonably relied upon by experts in the particular field." *See* FED. R. EVID. 703*; see also* Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 229–276 (2d ed. 2000) (detailing survey use in litigation).

Such conflicting expert evidence is common in all litigation and particularly in trademark cases. *See* 6 MCCARTHY § 32.158 ("If one side takes a survey, often the other side will do so too, hoping to present the court with offsetting data to nullify the impact of the first survey."). "The battle of experts that ensues is frequently unedifying." *Indianapolis Colts v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 415 (7th Cir.

1994) (Posner, J.).

The parties have presented conflicting, inconclusive and ultimately unilluminating survey evidence.  Absent anecdotal evidence of actual consumers who were confused and in light of the conflicting surveys, analysis of this factor is largely unhelpful.

## 8.    Overall Finding of a Likelihood of Confusion

After a review of the law and careful examination of the summary judgment evidence submitted in this matter, the conclusion is inescapable that a likelihood of confusion exists between Plaintiffs' "America's Team" mark and Defendant's "America's Team" mark.  A majority of the factors weighs heavily in favor of Plaintiffs, while the other factors are at least neutral or tilt slightly in Plaintiffs' favor.  Defendant has failed to identify any genuine issues of material fact, instead disputing the inferences to be drawn in the Court's analysis of the various factors.   Although the factors are nondispositive and nonexclusive, their overwhelming weight here confirms that summary judgment is appropriate for Plaintiffs.

To be clear, the Court does not hold that the Dallas Cowboys are "America's Team" or that the organization necessarily has any more claim to the title than the Pittsburgh Steelers, Green Bay Packers, New York Yankees, Atlanta Braves, Notre Dame Fighting Irish, 1980 Olympic hockey team, or any other broadly popular team.  The Court does find, however, that the Dallas Cowboys have trademark priority over Defendant with respect to the term "America's Team."  Defendant's argument that other

professional and amateur sports teams may have a reasonable claim to the term amounts to a *jus tertii* argument. This conflicts with "the prudential, discretionary limit federal courts have imposed on their exercise of Article III powers-the rule against jus tertii standing" in most instances. *Playboy Enterprises, Inc. v. Public Service Com'n of Puerto Rico*, 906 F.2d 25, 36 (1st Cir. 1990). A plaintiff generally must assert its own legal rights, without resting its claim for relief on the rights of third parties. *Secretary of State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 955 (1984); *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In the trademark context, according to Professor McCarthy: "So long as plaintiff proves rights superior to defendant, that is enough. Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world." 6. J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (hereinafter "MCCARTHY") § 31:160 (4th ed. 1006) Here, the Dallas Cowboys have proven rights superior to Defendant. That is enough.

Consequently, the Court grants summary judgment for the Dallas Cowboys and NFL Properties on all infringement counts in the Amended Complaint. The Court further declares the Cowboys and NFLP do not infringe Defendant's mark.

### D.   Dilution

Trademark dilution is the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product. *See Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 812 (Tex. App.—Austin 2001,

pet. denied.) ("Dilution involves the gradual 'whittling away' of a party's distinctive mark through unauthorized use by another.").   The Federal Trademark Dilution Revision Act of 2006 ("TDRA") bars "use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).  Texas' anti-dilution statute provides relief to owners of "distinctive" marks.  TEX. BUS. & COMM. CODE § 16.29; *see Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 899 (Tex. App.—Dallas 2001, no pet.).

Dilution may occur through blurring or tarnishing.  15 U.S.C. § 1125(c)(1)*; Westchester Media*, 214 F.3d at 670 n.12.  Blurring involves a diminution in the uniqueness or individuality of a mark because of its use on unrelated goods.  *See* 4 MCCARTHY § 24:68.  To determine dilution by blurring, a court "may consider all relevant factors" including: the degree of similarity between the mark or trade name and the famous mark; the degree of inherent or acquired distinctiveness of the famous mark; the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; the degree of recognition of the famous mark; whether the user of the mark or trade name intended to create an association with the famous mark; and any actual association between the mark or trade name and the famous mark.  15 U.S.C. § (c)(2)(B).

Tarnishing occurs when a trademark is "'linked to products of shoddy quality, or

is portrayed in an unwholesome or unsavory context,' with the result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.'" *Scott Fetzer*, 381 F.3d at 489 (quoting *Hormel Foods Corp. v. Jim Henson Productions*, 73 F.3d 497, 507 (2d Cir. 1996)). Tarnishing "is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C).

Texas anti-dilution law requires that the plaintiff establish "an act likely to injure a business reputation or to dilute the distinctive quality of a mark . . . regardless of whether there is competition between the parties or confusion as to the source of goods or services. TEX. BUS. & COM. CODE § 16.29 (emphasis added); *see Westchester Media*, 214 F.3d at 670 & n.16.

The Court, in assessing the Cowboys' trademark for secondary meaning, has determined the team's "America's Team" mark is distinctive, a necessary prerequisite protection under Texas dilution law. Federal law requires a higher standard, requiring a mark to be "famous" as well as distinctive. 15 U.S.C. § 1125(c)(1). "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Id.* § 1125(c)(2)(A). In determining fame, a court "may consider all relevant factors" including the duration, extent, and geographic reach of advertising and publicity of the mark; the amount, volume, and geographic extent of sales of goods or services offered

- 32 -

under the mark; the extent of actual recognition of the mark; and whether the mark was registered. *Id.* Although their mark was not registered federally, Plaintiffs have established the long duration and geographic reach of their "America's Team" mark. Plaintiffs' survey demonstrates actual recognition among a relevant consumer base. And, as Plaintiffs note, Defendant *itself* has declared the mark famous. The summary judgment evidence shows Defendant sent letters in 2004 to various national retailers "seeking licensing opportunities for this famous mark." Defendant's 1998 auction advertisement offered "one of this country's most recognizable trademarks." Defendant cannot now credibly claim the mark has no fame.

Plaintiffs complain that Defendant's use of "America's Team," particularly on items like the baseball cap adorned with stars and in handing out the "America's Team Award," blurs the uniqueness and individuality of its mark both nationally and in Texas. "Defendant is essentially in the business of blurring the Cowboys' America's Team trademark, in that its very purpose is to bestow the 'America's Team Award' on sports organizations other than the Dallas Cowboys," Plaintiffs argue. A consideration of the relevant factors on blurring shows a high degree of similarity between Defendant's mark and the Cowboys' famous mark and that Defendant intended to create an association with the famous mark.

Plaintiffs also complain of the inferior quality of Defendant's products and website, which they allege tarnish the Cowboys' trademark. Plaintiffs' evidence shows

Defendant in 2006 distributed thousands of "America's Team" wristbands with the word "basketball" misspelled.  Certainly such shoddy goods can harm "the reputation of the famous mark."  *See* 15 U.S.C. § 1125(c)(2)(C).  Thus, Plaintiffs have established dilution under federal and state law.

### E.      Remedies

#### 1.      Trademark Cancellation

The Dallas Cowboys and NFLP urge the Court to cancel ATP's registration of the '914 trademark pursuant to its power under the Lanham Act: "In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119.

The Lanham Act provides that no trademark registration shall be issued if it "[c]onsists of or comprises a mark which so resembles . . . a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive . . . ."  Lanham Act § 2, 15 U.S.C. § 1052(d).  "One who opposes registration . . . is attempting to protect his individual rights . . . by preventing registration of a mark so similar to that which he asserts identifies source that concurrent use of the two is likely to cause confusion and thus foil the function of his means of

- 34 -

identification." *Otto Roth & Co., Inc. v. Universal Foods Corp.*, 640 F.2d 1317, 1320 (C.C.P.A. 1981). A non-registrant can rebut a presumption of trademark validity by showing that the registrant had not established valid ownership rights in the mark at the time of registration—"in other words, if the non-registrant can show that he used the mark in commerce first, then the registration may be invalidated." *Sengoku Works*, 96 F.3d at 1220. A mark that has achieved "incontestable" status (i.e., a mark that has been registered for more than five years) may be cancelled or assigned to the proper owner if the mark is being used to misrepresent the source of goods or services; the mark suggests a false connection with an institution; or the mark was obtained fraudulently. *See* 15 U.S.C. §§ 1052(a), 1064(3).

Section 33(b)(1) of the Lanham Act provides a defense against a registered mark when a "registration . . . was obtained fraudulently." 15 U.S.C. § 1115(b)(1). In such an instance, it is proper to order cancellation of that party's registration. *See Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986). The moving party bears a heavy burden in proving fraud in the procurement of a registration. *W. D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.*, 377 F.2d 1001, 1003 (C.C.P.A. 1967). "A person can commit fraud upon the [USPTO] by willfully failing to correct his or her own misrepresentation, even if originally innocent, as long as that person subsequently learns of the misrepresentation, and knows that the Office has relied upon that misrepresentation in conferring a substantive benefit upon that person to which the person knows it is not

entitled." *Space Base Inc. v. Stadis Corp.*, 17 U.S.P.Q.2d 1216, 1219 (T.T.A.B. 1990).

Defendants cite a 2003 decision by the USPTO Trademark Trial and Appeal Board involving a challenge to its "America's Team" trademark by the United States Olympic Committee ("USOC"). *See United States Olympic Comm. v. MEOB, Inc. and America's Team Properties, Inc.*, No. 92025167, (T.T.A.B. Sept. 30, 2003). The lone issue before the TTAB was abandonment. The second ground for cancellation, "false suggestion of a connection" under Trademark Act Section 2, 15 U.S.C. § 1052(a), was technically waived by the USOC because its brief made no argument on that ground. This decision does not represent a *res judiciata* bar to the instant case. Indeed, the TTAB only found that the USOC failed to prove the mark had been abandoned. It made no finding about a "false suggestion of a connection" and specifically states that it did not consider the argument that America's Team Properties never made bona fide use of the mark in commerce prior to filing its statement of use. *Id.* at 2, 10 n.6.

Plaintiffs' summary judgment submission includes evidence that the USPTO recognized the Cowboys' common law rights to the trademark in 1989, when it refused to issue a trademark for the term to a California couple who had applied for it. The USPTO's refusal, mailed November 27, 1989, stated: "The Examining Attorney refuses registration because the mark consists of or comprises matter which may falsely suggest a connection with the Dallas Cowboys." Plf.'s App. at 1130. The USPTO enclosed copies of nineteen newspaper articles "which address the Dallas Cowboys as America's

Team." *Id.* The attempted registration by that California couple was abandoned on May 29, 1990—just eight days before MEOB filed its intent-to-use application with the USPTO.

Plaintiffs' evidence also includes documentation from MEOB's attorneys in 1990 informing Nash, the president of MEOB, of a "direct conflict" with the California couple's prior attempt to trademark the term. In May 1990, his attorneys had received the file history for the previous trademark effort, including the USPTO's refusal to issue the trademark because it conflicted with the Cowboys' use. In a sworn deposition in the present case, Nash admitted that his attorney advised him against seeking registration back in 1990, but Nash "made a business decision to pursue it." Nevertheless, Nash provided a declaration to the USPTO stating that he knew of no one using the term even though he had actual knowledge that "America's Team" was used by other entities at the time of his sworn declaration. Reichel likewise claims he did not have any personal knowledge of a claim of right by the Cowboys to the mark when he acquired it. If this is true, Reichel was at least willfully ignorant of the Cowboys' use of the mark.

It is unclear why the USPTO granted MEOB a trademark for "America's Team" given its prior rejection of the California partnership's application for a trademark in the term. Nevertheless, it is apparent that Defendant's use of the mark falsely suggests a connection to the Dallas Cowboys and the NFL. This use is likely to cause confusion, mistake, or to deceive potential purchasers. *See* 15 U.S.C. § 1052(d). It is further

apparent to this Court that Defendant's trademark was fraudulently obtained. Fraud is rarely proven directly, but may be inferred through circumstantial evidence, the weight of which is overwhelming here. Thus, Defendant's trademark for "America's Team," U.S. Trademark Reg. No. 1,899,914, is hereby **CANCELLED**.

The Court cannot, at this point, cancel or refuse registration of the entirety of the broad spectrum of pending trademark applications by Defendant. Plaintiffs have asserted no claim to a trademark in the letters "AT," as they have not used the mark in commerce. Such a challenge is better left to another corporate entity that uses a similar designation, such as AT&T.

### 2. Injunctive Relief

Plaintiffs request the Court enjoin Defendant's use of "America's Team." The TDRA provides: "Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1). Pursuant to the Act, "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Id.* § 1125(c)(2)(A). Texas law

similarly provides for injunctive relief for trademark dilution.  TEX. BUS. & COMM. CODE § 16.29.

The text of the federal statute is clear and unambiguous: the owner of a famous, distinctive mark that is diluted is *entitled* to an injunction.  *Id.* § 1125(c)(1) (emphasis added).  Having determined dilution by Defendant, the Court finds Plaintiff is entitled to an injunction pursuant to 15 U.S.C. § 1125(c)(1) to protect its mark, subject to the principles of equity.

## IV.    Conclusion

Because their protectable rights in the "America's Team" trademark are superior to Defendant's and a likelihood of confusion exists, Plaintiffs' motion for summary judgment is **GRANTED** and U.S. Trademark Reg. No. 1,899,914 is hereby **CANCELLED**.  Consequently, Defendant's motion for summary judgment is **DENIED**. The Clerk of Court is directed to provide to the Director of the United States Patent and Trademark Office a certified copy of this order.

The Defendant, its officers, agents, servants, employees, attorneys, and any other persons in active concert or participation with them are hereby **ENJOINED** from using the "America's Team" mark or any other confusingly similar designation in the production, manufacture, advertisement, promotion, displaying for sale, offering for sale, sale, or distribution of any articles of merchandise in a context indicative of the Dallas Cowboys or American football.  Defendant shall immediately proceed with due diligence

to remove any reference to "America's Team" or any other confusingly similar designation from its products, website, and promotional materials.  Defendant is further **ENJOINED** from any other actions or inactions calculated to cause confusion, mistake, deceive consumers, or otherwise tending to create any impression that Defendant's goods are owned, sponsored by, or otherwise affiliated with Plaintiffs.

The parties are hereby directed to draft a final judgment consistent with this memorandum opinion and order.  A proposed judgment, approved as to form and signed by counsel for both parties, must be submitted to the Court within ten (10) days of the date of this order.

**SO ORDERED.**

Signed March 30th, 2009.

_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE

- 40 -